OF

# THE SUPREME COURT

OF THE

## STATE OF ILLINOIS,

APRIL TERM, 1859, AT OTTAWA.

WM. BENNETT, and WM. H. STOW, Plaintiffs in Error, *v.* HENRY WALLER *et al.,* Defendants in Error.

APPEAL FROM COOK COUNTY COURT OF COMMON PLEAS.

A court of equity has jurisdiction to compel the heir of a deceased grantor to execute a conveyance, in lieu of an unrecorded deed which has been lost.

Parol proof of the contents of a lost deed, must be so clear as not to leave any reasonable doubt as to the substance of the material parts of the paper.

Where a deed is delivered to another than the grantee, for the express purpose of having it take effect, and the grantee subsequently approves of such act by promising to call for it, the title will vest in him.

A quit-claim deed with a covenant for further assurance, will enable a holder to take the benefit of any subsequently acquired title in a grantor.

After proof taken, it is too late to urge that an affidavit of the loss of a deed was not filed with the bill.

By the original bill, it is alleged, that sometime on or about the 27th of December, 1834, William Bennett, the father of the present defendant, purchased of the United States the premises in question.

That subsequently, and in the same year, William Bennett, sen., bargained and sold the premises for a valuable consideration, to one James Kinzie.

That, subsequently to such bargain and sale, the complainants became, and have since been and now are, severally seized in fee of the respective shares and proportions of the said premises, stated and set forth in said bill, through mesne conveyances

7

from said Kinzie. That no conveyance of the premises was executed by Bennett to Kinzie at the time of such bargain and sale, nor until sometime in the year 1838 or 1839, when the elder Bennett executed a deed of conveyance of the same to said Kinzie, his heirs and assigns, which was afterwards, in the year last mentioned, delivered by said Bennett to one Rufus Soules, with instructions to deliver the same to James Kinzie.

That said deed was never delivered by said Soules, and has since been accidentally lost or destroyed, and is not in the possession or custody of said complainants, nor has the said deed ever been recorded.

That on the 3rd day of July, 1854, complainants filed their petition to perpetuate the testimony of the said Rufus Soules, and that such proceedings were had, that the testimony of said Rufus Soules was duly taken under a *dedimus potestatem* from this court, and returned to the office of the clerk thereof, and has been duly recorded therein.

The testimony of said Soules is set out in full, and it is alleged that it fully appears by said testimony, that a deed of the said premises was duly executed by the said Bennett to the said Kinzie, as above stated.

That the consideration of the said deed was fully paid.

That said Kinzie, and those claiming under him, have been in possession of said premises up to the time complainants purchased, and since that time they, (said complainants,) have had full and undisputed possession, and that neither Bennett, nor any one claiming under him, has ever had adverse possession.

That Rachael Bennett, wife of the said William Bennett, sen., has released her right of dower to complainants.

That said William Bennett, sen., departed from this State in 1838 or 1839, and has never since been heard from, and is dead.

That said William Bennett, sen., left at his departure a son, who is now living, and a minor, and is the sole heir of said William Bennett, sen., deceased.

That the loss and destruction of said deed greatly and injuriously clouds, prejudices and endangers the interest of complainants in the said premises, and that unless relieved they cannot peaceably possess or safely convey said land.

The bill prays for the appointment of a guardian *ad litem*, and that such guardian, for and in behalf of said William Bennett, may, under the direction of the court, execute a quit-claim deed of the premises to complainants, or that such conveyance may be executed by a master of the court under its direction.

And that said William Bennett may be forever barred and precluded from setting up any claim, title or interest in said premises.

By a supplemental bill duly filed at a subsequent date, March 3rd, 1855, one William H. Stow is made a party defendant to said suit, but the said supplemental bill contains no additional allegations affecting the rights of· said William Bennett.

To this bill the said defendant, Bennett, interposed an answer, in which he, by his guardian *ad litem*, admits the title of his father, William Bennett, to the premises in question, his departure from the State, and death, and his own heirship as stated in the bill, but denies the execution of any deed or other conveyance by William Bennett to said Kinzie, and claims the said premises in fee as heir to his said father.

Bennett filed his cross-bill in said cause, in which, after setting up and reciting the original bill of the complainants, and the subsequent pleadings in the cause, and alleging title of William Bennett, sen., to the premises, as stated in original bill of complainants, the departure of said William Bennett, sen., from the State of Illinois, about the year 1839, his continued absence since that time, the fruitless search and inquiry for him by the said defendant and his family, alleges that said William Bennett, sen., is deceased, and that he died seized of the premises in fee, and that he, said defendant, thereupon became seized of a like estate therein, as sole heir at law of said William Bennett, sen.

Said cross-bill further denies the conveyance of said premises by said William Bennett, sen., to James Kinzie, as alleged in original and supplemental bill of complainants, as well as all title of complainants in the premises.

Denies the truth of the testimony of Rufus Soules taken to be perpetuated, as stated in original bill, and alleges that the same was taken without notice to him, said William Bennett, jr.

Alleges that the pretended deed of said William H. Stow is a forgery.

Denies all knowledge of, or assent to, the trust deed executed by said Stow to said defendant, and disclaims all interest in the same.

Alleges that the said pretended deed from William Bennett, sen., to James Kinzie, and the said fraudulent and forged conveyance purporting to have been executed· by William H. Stow to said defendant, are clouds upon the said defendant's title to said premises ; and

Prays that all these pretended and fraudulent conveyances may be set aside and canceled, and for perpetual injunction against them.

On the 25th of January, 1858, the defendant, Stow, filed in said cause his answer to the cross-bill, in which he denies that the elder Bennett is dead; alleges that he was living on the 26th of January, 1855. Admits the title of the complainants

in the original bill to be fabricated. Admits that he presented the deed mentioned in the cross-bill, purporting to be from William Bennett, sen., to himself, to the register of Cook county, to be recorded; denies that it is a forgery. Alleges that the signatures thereto are genuine; that he paid $20,000 for the premises, and that he purchased them in good faith.

On the 13th of February, 1858, the defendant, Bennett, filed his replication to the answer of defendant, Stow, to the cross-bill.

To this cross-bill an answer was duly filed by the said complainants in the original bill, in which they substantially deny the equity of said bill, by setting up their own title substantially as stated in their original bill.

The said defendant, Henry Waller, further, in said answer, alleges a title to a portion of the said premises, acquired by payment of taxes, under statute of the State, to wit: " An act to quiet possession and confirm titles to land, approved March 2nd, 1839."

That said Bennett, sen., was heard from by his wife in 1844 or 1845, at New Orleans, alive, and that said defendant, Waller, under color of certain title deeds from James Kinzie and his grantors, paid taxes on said portion of said premises, to wit: the north one-half thereof, for nine years, to wit: from 1841 to 1849, inclusive, and that the same was vacant and unoccupied.

To this answer a replication was duly filed by the defendant, Bennett.

Throughout these pleadings, as between the complainants in the original bill and the defendant, Bennett, the following allegations of the said complainants are fully admitted and affirmed by both parties, to wit:

Both allege and admit that sometime in 1834, William Bennett, sen., became the owner in fee of the premises by purchase from the United States.

That sometime during the years 1838 or 9, he left the State of Illinois for parts unknown.

That said William Bennett, sen., is dead.

That said William Bennett, defendant, is his sole heir.

That the pretended deed from William Bennett, sen., to William H. Stow, is a forgery.

On the part of said complainants it is alleged that sometime in 1834, the said William Bennett, sen., bargained and sold the premises, for a valuable consideration, to one James Kinzie, and sometime in 1838 or 9, actually conveyed the same to him by quit-claim deed, and that they (complainants) are seized in fee simple of the said premises, under mesne conveyances from said Kinzie.

That said Kinzie and his grantees have ever since been in possession.

That complainants are now in possession.

That said conveyance from William Bennett, sen., is lost.

These last four allegations are distinctly denied by the pleadings interposed on behalf of said Bennett.

Each of these parties prays for, substantially, the same relief, but upon somewhat different grounds.

The supplemental bill, after stating the substance of the original bill, sets forth that Stow filed for record in the office of the recorder of deeds in Cook county, a certain writing, purporting to be a deed from William Bennett, of the land in controversy.

Charges that this deed is a forgery, and contrived and procured by Stow to defraud complainants.

Refers to proceedings to perpetuate the testimony of Soules, and charges Stow with notice.

Charges that Bennett had not been heard from for near sixteen years, and that Stow, knowing that he was dead, caused a deed to be made, to defraud complainants, and that the signature of Bennett's name to said deed is a forged signature.

Sets forth that Stow had made a trust deed of twenty acres of the premises to secure $500 to defendant, Bennett, which is made an exhibit to the bill; that no such debt existed from Stow to said Bennett; that this pretended trust deed was fraudulently contrived by Stow, without the knowledge or sanction of Bennett.

Prays an injunction to prevent recorder from giving said deeds to Stow or Bennett; that the same may be canceled, and set aside; that Stow and Bennett be forbidden to make any conveyance of said premises, and for further relief.

Stow's answer to the original and supplemental bills, admits Bennett, sen., bought of the United States, the premises described. Denies Bennett's death, and avers that on January 26th, 1855, he saw William Bennett, the original purchaser of the land from government, whom defendant personally well knew, and from him received the deed of said premises.

Denies, on information from Bennett, that he ever sold said premises to James Kinzie, under whom complainants claim title, or to any other person, or made any conveyance thereof, or any agreement for a conveyance thereof, to any person, prior to deed to defendant.

Denies that Bennett ever sold said premises to J. Kinzie; that he ever executed a deed to him; that he ever delivered any deed, as alleged, to Soules, for Kinzie.

Admits that Bennett, sen., left the State in the fall of 1839. Avers that he is still living; defendant saw him January 26th, 1855; conversed with him. Admits that said W. Bennett had a son, a minor, the only child of said Bennett, as informed.

Denies knowledge of proceedings to perpetuate testimony of Soules, and insists that his testimony is not true.

Denies that complainants, until lately, had any possession of the premises; admits that the track of the railroad company crosses the land, but without right.

Admits delivery of the deed frem Bennett to Stow by him to recorder for record, which deed was executed by Bennett, the original purchaser, and by which Bennett conveyed said premises to defendant, and his right therein.

Avers that he knew Bennett before he left the State in 1839; that said deed was made and signed by said Bennett, and no other person. Denies the charges of forgery and fraud in the supplemental bill; avers he paid Bennett $20,000 for said land; $10,000 in cash, and $10,000 in notes of defendant, and agreed to pay further $500 to said minor, and made said trust deed for that purpose, and that said conveyance of said land was made by said Bennett in consideration thereof.

Stow affirms that the elder Bennett was still alive January 26th, 1855, and that he then, for a valuable consideration, and in good faith, sold and conveyed the premises, which he bought of the government in 1834, to himself.

Both Stow and Bennett deny the title of complainants, and the deed to Kinzie, its delivery to Soules, its loss, etc.

Both Bennett and Waller *et al.* deny that W. Bennett, sen., was alive in January, 1855, as averred by Stow, and contend that the pretended conveyance from him to Stow is false.

Stow contests Waller's possession and payment of taxes on the land in question, as alleged in supplemental bill.

The original bill was filed in the Cook county Circuit Court, against the defendant, Bennett.

The supplemental bill was filed in the same court, against the defendants, Bennett and Stow, to bring in the defendant, Stow.

The venue in this cause was changed to the Cook County Court of Common Pleas.

On the 13th of June, 1857, the court ordered a commission to issue to J. G. Knapp, Edward Ilsley, Amasa Cobb, and J. J. R. Pease, all of the State of Wisconsin, authorizing and empowering, and directing them, or one of them, to take the oral cross-examination of James Kinzie.

On the 29th of June, a decree was made in the cause, that the said William Bennett, son and heir of the elder Bennett, should execute, acknowledge and deliver, after he shall have become twenty-one years of age, a quit-claim deed to James Kinzie, of the premises, which deed is to stand and be of same effect as the alleged lost deed, and that the same shall enure to complainants, deriving title from or under Kinzie, to the extent of

their respective titles, and interest, or in default of the younger Bennett executing such deed, that one be executed by a master.

That the said Bennett have six months after his majority to show cause against the decree; that the pretended deed from Bennett to Stow, and the said trust deed, be declared fraudulent and be set aside; and that the defendant, Stow, be enjoined from conveying, etc.

The defendant, Bennett, prayed an appeal to this court, which was allowed.

*Rufus Soules* testifies, in substance, that he was acquainted with William Bennett some considerable time before 1838; does not recollect when he first became acquainted with him. Was acquainted with him two or three years. He had a wife when he knew him; knew her by sight only. Thinks they had stayed at his house over night.

That sometime in 1838 or 9, thinks in '38, Bennett left with him a deed, from himself and wife to James Kinzie, for the same land described in the duplicate. Thinks it was made in Chicago. Recollects of its being a proper deed signed by Bennett and wife. Can't say whether it was printed or written; thinks it was written; pretty sure it was written. Cannot state what the date of the deed was; thinks it was dated in 1838, and "my reason for thinking so is, that from the way it was left by Bennett for Kinzie, I concluded that he had made a recent trade with Kinzie."

That Bennett left the deed and duplicate with him " to be delivered to James Kinzie, when he should [call for them." Thinks the next season or spring, as he was riding to Chicago in the stage with Kinzie, he spoke about papers left with him, and asked if I knew anything about them. I told him I had them, and he said he would call and take them. .

Recollects nothing more that Bennett said when he left the deed, except that he said he wanted me to take the papers and keep them, and deliver them to Kinzie when he called for them.

As near as I can remember, I kept it in my possession up to the time my first deposition was taken, in September, 1850, or a little before, when Rees called on me for deed and duplicate. I hunted for them among my papers, but found only the duplicate, and handed it to Rees.

All the indorsements now on the back of the duplicate were on when left, except certificate of Augustus B. Coles. I am satisfied the other indorsements were on it.

I compared the description in duplicate with description in deed; they were the same property.

Deed and duplicate were delivered to me at my old tavern stand, in Lake county, in this State.

I don't recollect of any particular words spoken by Bennett, any more than I have stated, "and what I gathered from him that he had sold the land to Kinzie." I did not deliver the deed to any one, to my recollection; if to any one, it was to Kinzie. He was at my house once afterwards, and stayed all night, after we talked of it in the stage, and was never there after; if I delivered it all, it was then.

The deed is lost; I never could find it; I made several diligent searches.

I think deed and duplicate remained in my possession five or six years; I then ceased to see them; I never compared them but once.

Read the duplicate once through, and partly through several times.

I think the duplicate was dated 1834; can't recollect month or day, nor number.

Is positive deed was signed by the wife.

It was finished out for man and wife.

It was a regular deed; I think Mrs. Bennett's name was Rachel or Rebecca; it begun with 'R.'

According to my best recollection I think it was acknowledged by Bennett and wife. I cannot remember before whom, nor at what time or place; I think in Chicago.

Cannot recollect what Bennett said further than I have stated. I think he said he would not deliver the papers to any other person. I thought this singular, as we never had any private conversation; were not intimate. I believe it was the last time I saw him. I can't recollect what the consideration was; it strikes me it was not much of a price he gave for it.

I think I compared deed and certificate not more than one or two years after I got them.

The land in deed and duplicate were the same. I can only recollect the description in the deed this way; I know they were the same. I thought it singular Kinzie did not call for it, and thought I would see what it was. There was no warranty in the deed.

Rees said he would pay me handsomely if I would find the deed. In giving a description of the land, I depend entirely on my comparison.

*Ursula Soules* testifies, that she is not particularly acquainted with William Bennett; saw him at their house on the O'Plain, a short time before they left it; not more than a year; they left it in 1844 or 5. That she saw an instrument in writing, with Bennett's name on it, among Mr. Soule's papers; it was a deed from William Bennett to James Kinzie. Saw it a number of times; have frequently taken it up and read a few lines of it.

*James Kinzie* testifies, in substance, that he knew William Bennett; formerly lived in Chicago, and afterwards at or near Independence Grove, on the O'Plain. Don't know that he had any relations; believes he had a wife; thinks her name was Rachel. That he never purchased the premises in question of William Bennett, but did purchase some of it of Archibald Clybourne and Alexis Beaubien. That he never paid William Bennett any money or other consideration for said premises; that neither William Bennett nor his wife, nor either of them, executed, acknowledged or delivered to him, or to any other person in his behalf, to his knowledge, any deed or deeds of conveyance of the premises in question, or any part thereof. That he knows Soules, and has for sixteen years; has no recollection of riding in a stage with him; might have done so; has no recollection of ever talking with Soules about a duplicate or deed, and "am very certain he never told me that he had a deed for me."

On his cross-examination he stated, that he had been informed that Soules had made an affidavit that he had got a deed from Bennett and given it to him, (Kinzie); that he had no recollection of having such a deed; that he searched and inquired to see if he might have left such a paper, and where; that he has inquired of several of his acquaintances, and has been to Sheboygan to see if he could find such a deed. Thinks he saw Bennett as far back as 1838 or 1839. Says that he don't know that he could point out the boundaries of the land in question, but that he knows pretty near where it lies; that it lies on the west side of the south branch of the Chicago river. From the information he now has, he says, that William Bennett seems to have been the first owner of the land in question. Don't know whether he entered it with a float or with money; that he thinks he had a deed of the land before he sold it, but can't tell. Sometimes he bought and sold land the same day, before he got a deed; that he bought a part of it of Archibald Clybourne, and a part of it of Alexis Beaubien; these are all he recollects of buying of; thinks he bought of Beaubien first, and that Beaubien made him a deed. Does not know of whom Beaubien bought; might have known at the time; had no acquaintance with the title before he purchased of Beaubien; cannot recollect all the deeds he gave and received for this property; has none of them now in his possession. Ludby and Bennett never let me have a floating claim; might have let Walker have one. Bennett owed me about $70; has never paid me. Don't recollect when he (Kinzie) made the first deed for these lands, whether a patent had issued or not. Patents did not issue till sometime after people had bought their lands. Did not

know before he had left Chicago that Bennett had bought this land.

Kinzie was cross-examined by complainants orally, under commission, for the purpose of impeaching him, and showing that he was interested, but nothing was elicited by it.

The following deposition is given at length, as a curious specimen of detective art, and as refutatory of James Kinzie's testimony.

Deposition of *Timothy Webster*, taken the 13th July, 1857:

"State your name, age, residence and occupation.

My name is Timothy Webster, Jr.; I am thirty-five years of age; I reside in Chicago, Illinois; I am a detective policeman by occupation; I suppose it would be more proper to say, private detective policeman; I am in the employ of Allen Pinkerton, formerly called Pinkerton & Co.; I am employed by the year—engaged by the year; I receive $900 per year, disregarding my success in my undertakings. I am acquainted with James Kinzie, of Iowa county, Wisconsin; I made his acquaintance on the 14th of March last.

State how and why you became acquainted with him, and fully, the circumstances attending it.

I was sent out there by Mr. Pinkerton, to form an acquaintance with him, and if successful in making acquaintance with him, to see what he would say about a certain tract of land in Chicago, then in controversy between Waller, Bennett *et al.*, and finally to report to him at the first opportunity. I went down on Otter Creek, more properly called the Clyde; I saw some men working at the dam, at Kinzie's mill; I saw Mr. Kinzie sitting on a log near the dam, not knowing that it was Mr. Kinzie at the time; I sat down with him, and got into conversation with him about the country in that neighborhood; finally, at the conclusion of the conversation, he asked me to walk in the house with him; we sat there talking about the country, and other countries—California and Central America—and it was then drawing on towards night; it was not night. I asked him if he knew of any place that I could stop at for a few days; he said he did not, but to wait a few moments, when he walked into the other room—an adjoining room; in a few minutes he came out to the room in which I was sitting, and told me if I would put up with such accommodations as he would afford, I might stay with him; I told him I would be very glad to do so.

By what name did you introduce yourself to Mr. Kinzie, and what business did you represent yourself as being engaged in?

Peter G. Roe was the name that I introduced myself to Mr. Kinzie by; I told him I had been in California five or six years,

and I had come to Wisconsin for the purpose of buying land, if I could find any to suit me.[1]

How long did you remain in that neighborhood?

I made my home with Mr. Kinzie from the 14th of last March, until the last part of this June; I do n't remember the date exactly that I left; I can tell by referring to my memorandum; I have not got the latter part of my memorandum with me.

What were you engaged in whilst in that neighborhood?

Riding round the country with Mr. Kinzie.

What points in the county of Iowa, and in other counties in Wisconsin, did you visit in company with Mr. Kinzie?

I have been to Franklin, Iowa county, Dodgeville, Mineral Point, and to nearly all the other towns in the county; I have been to Platteville, which I think is in Lafayette county; Belmound, which I think is in the same county; I can name the towns but not the counties—Avoca, Muscada, Prairie Du Chien, Madison, Milwaukee, Racine.

What was the professed object, generally, of your visits to the different points in that neighborhood, and what was the general subject of conversation between Mr. Kinzie and yourself?

I generally went on the invitation of Mr. Kinzie, particularly to Racine; our conversation was upon everything that you could mention. The last time he went to Racine he told me he had received a letter from Mr. Millett, a lawyer in that place, and that letter stated that George E. Walker, of Ottawa, Illinois, was to be there during the week following, and he, Mr. Millett, wished to see them together at Racine; and he would like me to go with him, to make me acquainted with Mr. Walker of Ottawa. I went to Mineral Point with him on several occasions, at his special invitation; I went with him to Mineral Point when he went to take the election returns there from the town of Clyde, and also went with him when he went to attend a meeting of the board of supervisors, he being a member of the same. He and I did business there together after that. It was during our visits there, such as having bonds for deeds recorded, and other things, and another agreement which we had entered into, had that acknowledged. I had the bond recorded and acknowledged. The last payment on the agreement I had acknowledged; the first payment being made at Prairie Du Chien, and acknowledged there on the agreement.

Did you or not prosecute your purpose of attempting to buy land there, and what efforts did you make to get yourself acquainted with the land there?

I bought land there, and before buying, I rode and walked all over the surrounding country, for ten or fifteen miles, in that

neighborhood; I walked all over Mr. Kinzie's place with him at different times.

Why did you go over Mr. Kinzie's place so frequently?

To examine the quality of the land, and see the amount of timber he had on his place, and to see the condition of the farm generally.

Of whom did you buy land, and when was the proposition first made, and by whom?

I bought of Mr. James Kinzie; he proposed selling his place to me at our first interview, or as soon as I told him I was wanting to buy land.

How long was it from the date he proposed to sell, and the date you actually purchased of him?

He proposed selling me either on the 14th, 15th or 16th of March last; I bought of him on the 21st of April, at Prairie Du Chien.

Did you or not ever have a conversation with Mr. Kinzie in relation to the property in controversy in this suit?

I did; at the time he was urging me to buy his place, while on our way to Mineral Point, he began a conversation about property he once owned in Chicago; he said that I could not do better than to buy land.

Did you or not have more than one conversation on that subject?

Several different times.

When did the first conversation on that subject occur?

I can't remember as to dates; I think it was sometime towards the last of March or first of April; I can tell the exact date by referring to my memorandum.

Where did this first conversation take place?

It was either at Otter Creek, or on our way to Mineral Point; don't remember distinctly; can tell the exact place by referring to my memorandum.

Will you please turn to your memorandum, and state the time and place of the first conversation?

The 23rd March, at Otter Creek, on Kinzie's farm.

Please state fully how that conversation was introduced, and give the whole of it as it occurred, as fully as you can recollect.

As we were walking over his farm to look at it, he said I could not do better than to buy it, for land was increasing in value very fast, and he referred me to lands that he once owned in Chicago, not naming the lands at that time; that he had sold it some twenty or twenty-two or twenty-three years ago, and if he had kept it till now, it would have made a rich man of him, and that the said land was in law suit at that time, and he was bound to make forty or fifty thousand dollars out of it, or more.

He said it stood on a pivot, and he could knock it either one way or the other, as he pleased. That is about the amount of the conversation on that day, as near as I can recollect, without referring to my memorandum.

Did he tell you all this in one statement, or did you participate in what was said, and make observations of your own ?

He told me it all in one statement, and of his own accord.

Did he describe the land in that conversation, or state who the parties to the suit were ?

He did not.

When you went with Mr. Kinzie to Mineral Point, to take the returns of election, as already stated by you, did you or not have any conversation with him on the subject of the land in controversy in this suit ? if so, please state what it was.

I did have a conversation with him on that point, or on that subject. In the way of inducing me to buy his farm on Otter Creek, he told me that he once owned land in Chicago ; eighty acres of land in Chicago ; and if he had kept it until that time, that it would have made him a rich man ; that he had sold it to a man by the name of Cole, I think he said, about twenty-two years ago—he did not speak definite as to the time—but it was bound to make him rich yet. I asked him how he expected to get rich if he had sold it. He said he had only given a quit-claim deed for it, or a quit-claim bond for a deed ; it is so long that I can't recollect exactly, but on recollecting, it *was* a quit-claim deed. I asked him if they had not got abstracts ? He said he did not know ; but he and a man by the name of Walker —George E. Walker—had bought it, or rather a floating claim for eighty acres, and he afterwards made a trade with George E. Walker for the bond—Bennett's bond—William Bennett's bond ; this bond given by William Bennett to them or George E. Walker—I can't distinctly recollect now which it was—that he would give a deed for it when he received a patent from the land office. And before William Bennett gave the deed, he, James Kinzie, made a trade with George E. Walker of one thing and another, for William Bennett's bond on the eighty acres, and there had been a bond made out for him, or a deed made out for him. I asked him how much the land was worth now. He said about $500,000. I told him that was a pretty good price for eighty acres. He said it was, but that it was right in Chicago. I told him that might be, for there was land in New York city that was not worth so much. He said, but this is right in town, and a river ran along on one side of it, and a railroad run through or near it. I asked him if there was a depot on the ground or near it. He told me the railroad crossed the river, and the depot was in South Chicago. This

is about the substance of the conversation; I can't remember the whole of it without referring to my minutes. This conversation was on the way to and from Mineral Point. He said that Mr. Millett, of Racine, and him, were to have one-half of the remaining property after all expenses of the law suit were paid, should Bennett and others gain the suit. I asked him if Mr. Millett was a lawyer. He said he was. I told him to look out for those fellows, for they would eat the oyster and give him the shell. He said he had been in Chicago, a-talking to Bennett's guardian—Hugh Maher, Walker, and others, and during the conversation, they spoke of more counsel on the matter, and he asked them who was a good lawyer in Chicago —their best lawyer, and they told him that a man by the name of Stuart was a good lawyer. And I told them they had better get him; and they went right away and retained Mr. Stuart in the case; I understand the pronunciation of the word to be Stewart or Stuart; I spell it sometimes one way and sometimes the other; he did not tell me how it was spelled. Kinzie then said, Roe, they think I am too much of a lawyer to undertake to 'cheat me, or do me out of what they say they will do. I told him that I would not trust them. He said that Mr. Millett would attend to that part of it. He then went on to tell me the reason why he placed such confidence in Mr. Millett. He said that Mr. Millett, some time ago, had trouble with a woman in Racine, by the name of Allen; I think the name is Allen; I can tell by referring to my report; that he, Millett, used to take her out riding, and afterwards got to screwing her, and her husband found it out, and they were about to commence a suit against Millett, and he, Millett, found it out, and came to him, James Kinzie, and told him about it, and he told Millett to leave the matter to him, and he would fix it. And Millett told him to attend to it for him, and he, James Kinzie, went and saw Mrs. Allen, and told her that if she commenced suit, Millett would have her on the stand, and that would do her more hurt than all the money she would get out of Millett would do her good; and if she would settle it, that he would give her $25, and a grant for a piece of land. And she agreed to do it; then he, Kinzie, sat down and wrote on a piece of paper, setting forth that Millett had never screwed her, or had anything to do with her. She signed it, and he gave her the twenty-five dollars, and then went and saw Millett, and gave him the writing. He then asked me if he ought not to trust a man that he had done that for; I told him that I thought he had. I can't recollect any more.

Please examine the paper marked exhibit " P. G. R.," now shown you, in the cross-examination of James Kinzie, and state

under what circumstances it was given by him, and the conversation that occurred about the time the trade was made ?

We were in Prairie du Chien on the 21st of April last, I think it was; Mr. Kinzie and myself were walking out round the town; met a gentleman by the name of Leonard, one of Kinzie's acquaintances, and we got in conversation about town lots. After Mr. Leonard left us, Mr. Kinzie said to me, Roe, property has the same chance to rise here as it had in Chicago when I sold that property of mine, or that property that I once owned; that was his language. I told him that if I bought his farm on Otter Creek, and remained out West, that he must let me have an interest with him in the 80 acres in Chicago; he told me he would like to sell me an interest, but he did not like to give any writings on the agreement, for them fellows— Waller and others—would give any money to get hold of it, and that would knock things endways. I then asked him what he would take for his farm on Otter Creek; he told me he would tell me after he had thought of it for a few moments; in a short time he told me he would take five thousand dollars for the farm and mill property—in cash. I told him I would give $4,500 for it—pay him $300 then, and $200 in a few days, when my certificates of deposit came; I expected them every day; and the balance on the 10th of May, 1857; I think 10th of May was the date named. He thought it over for a few moments, and said, Roe, I will take your offer for the farm and mill. I told him we would get some lawyer to draw up a bond, and then I would pay him the $300; he said that was all right. In a short time after, I asked him what he was going to do about that other trade we were speaking of; he said he did not know exactly what to do. I then asked him what he would take for one-half of his interest; he said he would not take $20,000; I laughed at him; he said, by God! Roe, that is so, for it is a sure thing. I then asked him what he would take for one-tenth of his interest, and told him to name his price. He said he would not sell to any other man except me, for he said he could trust me; he was satisfied he could trust me with all he knew or had, and he would let me have one-tenth for $800 down, but I would have to trust to his honesty, for he did not like to give writing, for fear it might be lost. I told him he might die, then I would have nothing to show for it; then Millett and them fellows might euchre me. I then told him I would give him $500 for one-tenth of his interest. I then asked him if I understood him right—that he was to have one-half—he and Millett were to have one-half after all the expenses of the law suit were paid. He said that was as he had told me, and that was right, for that was the understanding. I then told him that I would give him

$200 down, and $300 in a few days, when I received my certificates of deposit; he asked me when I expected they would be there; I told him I was looking for them to come to Franklin in a day or two. He said he would take my offer, and sat down and wrote an agreement to that effect; he gave me the agreement, and told me to look out and not to lose it. He then—I think he wrote the bond himself, I am not certain; the bond for the farm and mill; I was thinking which he wrote first; he wrote the bond first, before giving the agreement—before writing the agreement. We then went to Mr. Blair's law office, and I gave him $300 on the bond for the farm and mill, and had it acknowledged. I then gave him $200 on the agreement, for one-tenth of his part in the Bennett eighty acres in Chicago, and was going to have it acknowledged—I was—and Kinzie took me to one side, and told me he did not wish any one to see it; I told him I would look out they didn't see the writing; he said, all right, go-ahead. I then had it acknowledged; the acknowledgment was taken by Mr. Blair, I think; we then went out in the street, and Kinzie told me to be careful that I did not lose the agreement, for Waller and them fellows would give ten thousand dollars to get hold of it; I told him I would look out for that, for I would put it somewheres where it would be safe. I can't recollect any more of our conversation on that subject.

Was there or not more than one bond for the land written?

There was.

State how many, and by whom written, and how it happened that more than one was written.

There were three written; the first was written by James Kinzie; then I wished an extension of time on the last payment, and he granted it, and Mr. Frost, of Mineral Point, wrote the second bond; that bond was given to me for Richard Lawrence; and through Mr. Kinzie's mistake in describing the land, Mr. Frost wrote the third bond.

What extension of the last payment was granted by Kinzie?

If I remember the dates right, it was from the 10th of May to the 1st of July, 1857.

Whilst Kinzie was selling out his farm to you, did he tell you that he had no interest in Chicago, or in the eighty acres, or in this suit?

He told me he had.

Did he tell you that if you bought, you must not expect to get a cent, or that he did not consider the interest bargained for, worth one cent?

He did not.

Did he say that if Bennett gained the suit he had no interest at all in it?

He did not.

Did he say it would be folly in you to buy any such claim as his, and that he did not wish to take money from you for which you would have no value?

He did not.

Did he say that whatever you paid he considered it paid on the farm?

He did not.

Did you introduce the subject of purchasing this interest on that occasion by telling him that you understood, and that somebody had told you, that he, Kinzie, had an interest in Chicago?

I did not.

Did he ask you what interest you meant?

He did not.

Did you state that he had an interest in eighty acres of land there?

I did not.

Did he reply that you were certainly under a mistake, and that he had no eighty acres of land there, and no interest in the eighty acres you alluded to?

There was no such conversation took place between us.

In the conversation with Kinzie during your trip to Mineral Point and back, was there or not any reference made by Kinzie to an interview with Mr. Waller? if so, state fully what was said.

He spoke of Mr. Waller, and said that he had been to Chicago for the purpose of seeing Mr. Waller; he saw him and told him that he could arrange all things right, so that he could gain the suit if he would give him thirty thousand dollars; and said, Roe, what do you think he offered me? I told him I did not know, but I supposed about $15,000. He said no, damn his melt, he only offered me one thousand. That was about all he said about Mr. Waller at that time, speaking of Mr. Waller alone.

Was or not anything said by him during that trip, about a deed from Bennett? if so, state what it was.

He said there was a deed made out, and Mr. Bennett left it and the receipt or receipts with a fellow in Illinois, and the damn fool lost the deed, and that was the cause of the whole fight; but he could straighten it, if he saw fit—he could straighten it for Mr. Waller, if he saw fit.

Did he or not make any threats of what he would do in case that Bennett, or those representing him, did not carry out their agreement with him? if so, state what he said.

He did; he said if they did not carry out what they agreed to, that Waller and them fellows should have the land, if he had to lie in prison the remainder of his life.

How often did you accompany Mr. Kinzie to Racine, at his invitation?

Twice.

What was the occasion of your first visit there with him, how long did you stay, and where did you go ?

I went with him. He told me he wished to see Mr. Millett, and he wished to make me acquainted with him, and he wished to talk to Mr. Millett about the Chicago matter. After we arrived there, we put up at the Baker House ; spent most of the time while there with Mr. Millett, and Paine, Millett's partner. He was going to Indiana ; it was his intention to go to Indiana from Racine. He told Mr. Millett that he was going to Indiana to pay young Jim Kinzie a mortgage he had against the mill or farm, I do n't know which he said. Mr. Millet told him he must not go, and he had better send for Kinzie to come—James Kinzie, the younger, his nephew—come and pay him there—come to Otter Creek and pay him there. Kinzie said if he said so, it would have to be so. Kinzie told me during that night, when we were in bed in Paine's house, that Millett had told him that Waller and them fellows wanted to take his deposition in Chicago, and he must not go there. I can't remember the time exactly that I did stay there, without referring to my report ; we spent our time with Mr. Millett while in Racine, at his office with him, and sometimes at his house, and at other times in different saloons, playing cards, drinking, and so forth. I came to Chicago from Racine, during my visit to Racine. Mr. Kinzie waited there until I returned.

What was the occasion of your second visit to Racine in company with Mr. Kinzie ? State fully what occurred, and what was said by Kinzie during that visit in reference to this suit, if anything.

A few weeks before we left Otter Creek for Racine, Mr. Kinzie told me he had received a letter from Mr. Millett, saying that George E. Walker, from Ottawa, would be at Racine some time in the week following, and he wished him, Kinzie, to come to Racine, so they would be there together, and he thought he would go on Monday or Tuesday if I would go with him. I told him to wait till the latter part of the week, and I would go ; he said he would ; and he wrote a letter and gave it to me to mail at Mineral Point for Mr. Millett. He read the letter to me before sending it ; the particulars of the letter—the whole of it, I cannot remember ; I made no minutes of the contents, but he stated in that letter to Mr. Millett that he would be at Racine the latter part of the week. On Thursday morning, I think it was, Kinzie and I left Otter Creek for Racine, and when we arrived at Racine we put up at the Baker House. The next morning we went to Millett's office to see him. Millett told Kinzie Walker was not there. During the conversation,

Kinzie told Millett that Roe and him would remain there till the first of next week. At some time during our visit there, Mr. Millett showed Mr. Kinzie a roll of papers; Mr. Kinzie asked him what they were; Millett told him that it was a copy of the questions, and his answers to the same, made at the investigation of the Chicago matter, and he got them for the purpose of his, Kinzie, looking at them before the next examination, if they had any. I think it was on Saturday that Mr. Millett told Kinzie that he had been thinking the matter over, and he came to the conclusion that he had better write to Mr. Walker, of Chicago, and have him come to Racine and see him, Kinzie, before he went home. Kinzie said he thought it was the best way. Then Millett sat down and wrote the letter, and took it to the post office. While he was gone, Kinzie told me that that letter was for Mr. Walker, one of the lawyers in that Chicago matter of ours. During our visit to Racine, Mr. Kinzie wrote a letter to George E. Walker; he showed me the outside of the letter, and it was directed to George E. Walker, mayor of Ottawa, Illinois. I asked him what was in the letter; he said nothing but a lot of stuff about a woman; that he had written the letter for the purpose of its being showed if they examined Mr. Walker again, for Waller and them fellows were sure to ask him, on the examination, if he, Walker, ever received any letter from him, Kinzie. He then said, Roe, this letter will, when showed, look as if Walker and I had nothing to say to one another about the Chicago matter, because, if we did, I would have said something in this letter to him about it. We spent our time running to saloons and other places, most of the time in Mr. Millett's company. We remained at Racine until Tuesday—Mr. Kinzie waiting for Mr. Walker to come from Chicago.

Was or not anything said by Kinzie during that visit about his giving his deposition or cross-examination, besides what you have already stated?

There was.

Please state what was said.

There was so much said that I cannot remember the whole conversation, without referring to my report made from minutes taken immediately after the conversation.

Were you present when a gentleman from Chicago, calling himself Warder, arrived at Mr. Kinzie's house, with a letter from Mr. Waller, sometime in May last?

I was.

Did you or not hear Mr. Kinzie speak of the subject of that letter, and of his interview with Mr. Warder? if so, state what he said.

It was on Saturday, a gentleman came to Mr. Kinzie's house,

and asked me if Mr. Kinzie was at home; I told him he was, and asked him into the room in which Mr. Kinzie was sitting. This gentleman and Mr. Kinzie entered into conversation, and I left the room. In a short time after, this gentleman came out and left. Kinzie came to me and said, Roe, that is a fellow that Mr. Waller sent up here with a letter of introduction, introducing him to me, and another letter wishing to know when I could come to Chicago, and give in my deposition. I asked him what this fellow's name was; he said it was Warder, and at the same time showing me the letter of introduction. He said he would show me the other letter on the first opportunity. I asked. him what he had told Mr. Warder on going down to Chicago; he said he had a letter already written and sealed to send to Mr. Waller; that Mr. Warder wished him to open it and write in it that he, Mr. Warder, had been there, and saw him, Mr. Kinzie. He said he told Mr. Warder that he would not do it. At the time Warder called, Mr. Kinzie had just adjourned a law suit, and there were a number of persons standing around. This letter refreshes my memory as to the other question—Racine—my last visit to Racine. Mr. Millett invited Mr. Kinzie and myself to his house to take tea one evening during our last visit at Racine; while sitting in Mr. Millett's house, Mr. Millett asked Kinzie what paper that was that he meant, that he mentioned in one of his letters he had written to him, that that fellow Mr. Waller sent to Otter Creek wished him to write on. He said that it was a letter that he had already written to send to Mr. Waller, and Mr. Warder wished him to open it and say in it, that he had been to his house, and saw him. Mr. Millett asked him if he had written anything that he wished him to, meaning Mr. Warder; he told him he had not. Millett told him if he did not do anything that they wished him to, that he would do right.

Did or not Mr. Kinzie, after Warder left, say anything about his coming to Chicago, and about his having business there?

He did not say he had any business in Chicago; he said he would not go to Chicago until the suit was ended, and if Mr. Waller wanted him, he would have to come out there to catch him, for he would not catch old birds with chaff.

Did he give any reason why he would not go to Chicago until this suit was ended? if so, state what it was.

He has given me reasons, but I can't remember whether it was at that time, or before, or afterwards. I think after that time, however, he said he had given in one deposition, and if he gave in another, it might knock things, and he had the best of Waller and them fellows, and meant [to keep it, and it was to his and my interest for him to keep away from Chicago.

In any of the conversations Mr. Kinzie had with you about these eighty acres of land, did he mention having sold any part to any person besides Cole? if so, state their names as far as you can recollect.

He did. He told me he had sold some of it to Mr. See, his father-in-law, and I think he said he sold some to John Kinzie, his brother. He said that that he had sold to Mr. See he took back in a short time afterwards.

How did Mr. Kinzie happen to be at Mineral Point on the day appointed, a few weeks since, for the taking of his deposition in this case?

Fore part of that week I took him with me under the pretense of going to Grant county and Lafayette county, to look at land. I kept in Lafayette county until the day set for taking his deposition. I told him that I wished to go through Mineral Point home, to Otter Creek; he wanted to start at sunrise in the morning. Being afraid that Mr. Waller had not arrived at Mineral Point, I put him off, till I was sure the train would have arrived at Mineral Point from Chicago. I then drove to Mineral Point, in company with Kinzie, and when we arrived at Mineral Point, I told him I would put up and take dinner at the United States Hotel.

Why did you take him away from home early in the week?

To keep him out of the way of Millett and others, and to have him beyond Mineral Point, so as to have to pass through Mineral Point, on the day set for taking his, Kinzie's, deposition.

Was he aware that his deposition was to be taken on that day?

I don't think he was; for if he had been aware, he would have told me.

Why did you try to keep him out of the way of Millett and others?

Because he told me that Millett would keep him posted on all their movements in Chicago in the matter, and I had heard Millett tell him myself that he would know how things were going on, and he would write to him, Kinzie, at least once a week, and he, Kinzie, must do the same. And he, Kinzie, had told me at different times, that Waller and them fellows would have to catch him before they took his deposition.

State what occurred between you and Mr. Kinzie, about the agreement as to the tenth interest, on the evening of Friday, the first day of taking his deposition at Mineral Point, and after we had concluded it for that day.

He asked me to let him have the agreement and he would give it back to me as soon as they had got through taking his deposition. I told him that they would not ask him anything

about it, and there was no use in his having it.  He said, very well; if they did ask him if he had ever sold an interest, he would deny it.

State what occurred between you and him, on the same subject, the next morning when he came down stairs, immediately after we had re-commenced his deposition.

I was in the office or sitting-room, in the United States Hotel, when he came to me, very much agitated, and asked me to walk in the bar-room adjoining the sitting-room.  I went in with him; he then asked me to give him that agreement, for Waller had asked him the question, if he had ever sold any interest in that Chicago eighty, and he wanted to have the agreement in his pocket, so that he could swear that he had not; then he would give it back to me after the examination.  I told him I had sent it home.  He said, by God, Roe, Waller has got it, then!  I told him I thought not.  He said if he had, everything was lost. I told him I thought he had not got it, and told him to keep cool and not get excited.  I then asked him up to the bar to take a drink; he called for some brandy.  I told him that would steady his nerves.  He said, yes; he would go up stairs and deny of ever having sold any interest, and went up stairs.

In the conversation with Kinzie about this suit, during your trip to Mineral Point and back, was there or not anything said about a horse, in connection with George E. Walker? if so, please state what was said by Kinzie.

He had spoken to me two or three times about a horse that Geo. E. Walker did own, and he wished me to buy it from Mr. Millett.  He said that during one of his visits to Racine, Geo. E. Walker was at Racine, with Mr. Millett, and Millett spoke to Kinzie about a horse that Walker then owned, and he, Kinzie, told Millett to buy the horse, and he did so, and was to give $250 for him.  I told him that I thought that was a large price for a horse.  He said he knew it, but they bought it to keep the devil still.  I asked him if he and Millett were buying horses of the devil.  He said, no, Roe; George E. Walker knows all about the Chicago matter, and me buying, or us, the land of William Bennett; and I told Millett to buy the horse for the purpose of keeping him right.  I said, if George E. Walker knows all about your buying the land of William Bennett, he may throw you.  He, Kinzie, said that he would not dare do it now, for he had already given in his deposition, and he could not remember of us ever buying any land of William Bennett; so he said in his deposition.  He then slapped his hand on my shoulder, and laughed, and said, you see, Roe, it is over twenty years ago since we bought the float, and it is hard work for a man to remember.

Did you ever say anything to Millett about your having purchased the tenth interest of Kinzie?

I did not.

Why did you not?

Because, before leaving Kinzie's house to go to Racine, he, Kinzie, said that I must not say anything to Millett about the agreement between him and me, or anything else about the Chicago matter; for he, Kinzie, did not wish Millett to know that I knew anything about the Chicago matter.

*Cross-Examination* by Mr. Stuart:

How long have you resided in Chicago?

Since January, 1856.

What was your last place of residence before coming to Chicago?

New York city.

How long had you resided in New York city?

A number of years; I could not tell without figuring it, but I think since 1835; but I have lived in New Jersey some of the time since my first going to New York to learn my trade, in 1835 or 1836.

In what place in New Jersey did you reside?

Princeton, then a town, now a city.

How long did you reside in Princeton?

I cannot say positive, without referring to my father's books, that being the only way that I can give the exact time, he being in business there.

State, according to your best recollection and belief, the length of time you resided at Princeton.

.In the neighborhood of ten or fifteen years.

Do you mean to be understood that you resided in Princeton in the neighborhood of ten or fifteen consecutive years.

I wish to be understood, that the reason why I cannot give the exact number of years is, because I have made my home at Princeton three or four different times, and I have never taxed my memory as to the number of years that I have lived there; therefore I cannot tell the exact number of years.

Do you mean to be understood that you resided in Princeton in the neighborhood of ten or fifteen consecutive years?

I do not.

How long before leaving this city, on your visit to Mr. Kinzie, were you advised that it was contemplated to dispatch an agent with a view of accomplishing the object of your mission?

I never heard or knew anything about the case whatever, until two or three days before my leaving Chicago for the town of Clyde, to make my acquaintance with Mr. Kinzie.

State the names of all the persons with whom you had either

interviews or conversations, in reference to the objects of your mission, prior to your departure.

Allen Pinkerton was the only person.

Did no other person than Pinkerton ever speak to you upon the subject before your departure ?

I received my only orders from Mr. Pinkerton ; I think Mr. Rucker spoke of Mr. Kinzie in the way of describing Mr. Kinzie ; I do not know whether he was addressing himself to me or Mr. Pinkerton. We were in Mr. Pinkerton's office at the time.

Did no other person than Pinkerton ever speak to you upon the subject before your departure ?

There did not, if Mr. Rucker was not addressing himself to me at the time spoken of in answer to the previous question.

Did you receive any instructions from Pinkerton, or any other person, in writing ?

He always gives me my instructions verbally, before leaving town ; he might have given me a slip of paper of the names of the towns which I would pass through and stop at, on my way out. I did not receive any other instructions.

Did you have, or take with you, any other written memoranda than the names of towns, as you have above represented ?

I think I did.

State what they were.

I think I had a number of memorandums with me, but they were of my own private business.

Did you understand me, in the last interrogatory, to refer to written memorandums upon the subject or object of your mission ?

I did not.

Did you understand me to refer to your own private memoranda, relating to matters wholly disconnected with this subject matter ?

I did, because the word " any " was used in the question.

Did you have, or take with you, any other written memoranda than the names of towns, as you have above represented, touching the subject matter ?

I think Mr. Pinkerton gave me a piece of paper, stating the lands which were in controversy were in West Chicago, for the purpose of my knowing that the lands were in West Chicago, if I made an acquaintance with Mr. Kinzie. And when he spoke to me about lands in Chicago, as he might have had lands in some other part of Chicago, then I would know what part of his conversation to work on. I cannot remember exactly whether I took this paper with me, or committed the substance of it to memory and tore it up, as I have done in a number of instances before.

Did this written memoranda contain anything else except a

statement of the fact that the lands in controversy, by you last above referred to, were situated in West Chicago ?

It did not.

Was that the fact which you state, that you were uncertain whether you committed to memory, or whether you took with you the written memorandum thereof ?

It was, for I generally commit all such things to memory.

Was there any other fact stated in the written memorandum ?

That was the substance of the memorandum, as I have already stated, and that was all that was required of me to commit to memory—the lands were in West Chicago.

Was there no other fact stated in the written memorandum ?

I think the names of the parties involved in the suit were written on it, but I cannot remember distinctly whether I committed that to memory from the slip of paper, or from Pinkerton himself.

Was no other fact contained in the written memorandum ?

That is all which I have stated—already stated..

Did you, yourself, make any written memoranda upon the subject, before leaving Chicago ?

I did not, excepting the hour and day I left the office, for I very frequently, at the time of leaving, write in my memorandum book the day, the time of the day that I leave the office, and to what place I am going.

Did you see in Mr. Pinkerton's office, or was there read over in your presence and hearing, before your departure, any written statement represented to be the facts of this case, or any part of the facts of this case ?

There was a paper read, giving me the whole career of the land from the time it was entered, I think, and some or all of the persons' names that had had anything to do with the land.

Did that memorandum purport to contain an abstract of the title to this property ?

I think this paper set forth the names of those that owned, or pretended to own, the land from the time it was purchased from government.

Do you mean to say that it contained a statement of the different conveyances from one to the other ?

I understood it as setting forth those that had, and those that did at this time claim the land.

Did it purport to represent the claim which was set up in behalf of the infant Bennett ?

I understood, by the reading of it, that he was one of those who laid claim to the land. Mr. Pinkerton only read the paper over once; he then gave me my orders to leave at such a time for the town of Clyde.

Did the memorandum allege, as a fact in the case, that the elder Bennett, before his departure from the State of Illinois, had executed a deed for this property to James Kinzie, which had been left by him with one Rufus Soules, to be delivered to said Kinzie.

I am under the impression that it read, that it was supposed that Mr. Bennett had left a deed with Mr. Soules, or some one else, for James Kinzie, and the deed could not be found by parties that were looking after it; I only heard it read once.

Did it further represent that Kinzie had denied knowledge of the execution or delivery for him of any such deed?

Not to my knowledge.

Were you acquainted with the fact that Kinzie had been examined as a witness in this cause?

Mr. Pinkerton told me he either had been or was to be.

Were you informed that Kinzie denied knowledge of the execution by Bennett of any such deed to him?

I was.

How did you become informed of that fact?

Mr. Pinkerton, in giving me my instructions, spoke of it.

Was not that fact, to your recollection, in the written memorandum read to you?

Not to my recollection.

Did this written memorandum make mention of the names of Mr. Millett, of Racine; Mr. George E. Walker, of Ottawa; Mr. Waller, of this city, an attorney in the cause; of Stuart, or either of them?

I am under the impression that it spoke of some of them, and it might have spoken of the whole of them.

Will you state fully what instructions and advice, in reference to your proceedings, you received from Mr. Pinkerton or others, distinguishing them?

Mr. Pinkerton was the only person from whom I received instructions, relative to this case; and instructions were as follows: To leave Chicago and go to Clyde and hunt up James Kinzie, and form an acquaintance with him, and as soon as I was satisfied that I had him fully in my confidence and me in his, to draw out of him all he knew, and how he acted about this Chicago eighty acres of land, now in controversy between Waller, Bennett and others, and report to him, Mr. Pinkerton, from time to time, as I progressed in the job.

Were any blank deeds, or forms of deeds, bonds, contracts or agreements furnished you, or were you provided with any such to use, or whereby you might be guided in the purchase or agreement for purchase of any lands, property, or interests therein, in case you should be able to make any such purchases,

or agreements for any such purchases, during your absence, from Mr. Kinzie, or any other person ?

There were not—I had not.

In case you should succeed in making any purchase from Mr. Kinzie of his supposed interest in this property, how was the money, wherewith to make the payment, to be obtained by you ?

There was nothing of that kind spoken of when I left Chicago for the town of Clyde, to form the acquaintance with Kinzie.

What arrangements or understanding were made before you left, as to how you were to be furnished with money to accomplish the objects of your mission ?

There was no arrangement nor understanding about the matter.

Had you authority, upon the happening of any contingency or emergency, to draw for or otherwise procure and employ any money ?

None whatever.

You said, did you not, in your examination in chief, " that your instructions were, to make the acquaintance of Mr. Kinzie, and to represent yourself as a purchaser of lands, or in quest of good locations which to purchase " ?

I did.

How did you expect to make such purchases, or successfully to deceive him by such representations, unless you were possessed of some means wherewith to make your payments ?

I did not at that time expect to make any such purchases; I merely used the term that I wished to purchase land, for the purpose of remaining in that neighborhood—showing an object for remaining in that neighborhood.

Will you state how much money you took with you from the city of Chicago to the State of Wisconsin, on this business, and from whom the same was received ?

I took sixty dollars, and received the same from Mr. Pinkerton.

How long after you had reached Wisconsin did you receive further sums of money, and from whom ?

On the second of April I received forty dollars from Mr. Pinkerton—sent to me from Mr. Pinkerton.

How was it received by you ?

I received it from a person who brought it from Mr. Pinkerton.

At what place did you receive it, and from whom ?

I received it at the town of Black Earth, from a person in Mr. Pinkerton's employ, known to me as Christy Stribble; that is the name he is known to me by.

How far is Black Earth from Clyde, the residence of Mr. Kinzie, and in what direction ?

I have never been told the distance, but I suppose about forty miles ; easterly direction.

Had you been advised that a messenger was to meet you there at that time ?

I had not.

Did you go there for the purpose of meeting any messenger ? I did.

How did you go, and with whom, if anybody ?

I went by railroad from Avoca, in company with no one, except the passengers on the cars.

How far is Avoca from the residence of James Kinzie ?

I should think, by the road, about seven miles.

By what conveyance did you reach Avoca from James Kinzie's ?

I have been there so often that I cannot tell how I went on that particular occasion.

Did you note the fact of that trip in your memorandum that you kept at the time, to which you have referred, and can you answer the question by reference thereto ?

I noted all facts which were essential to the business which I was in, and think I can tell by referring to my memorandum or report, how I went from James Kinzie's to Avoca on that occasion.

Will you please refer to your memorandum for the information, and make answer to the question, if possible ?

My memorandum has no note from leaving Mr. Kinzie's until the arrival in Avoca.

After this reference to your memorandum, are you able to state how you went from James Kinzie's to Avoca ?

I am not.

Upon what day, and hour of the day, did you take the cars at Avoca, on this your trip to Black Earth ?

On Thursday, the second of April, about ten thirty A. M.

How long before the departure of the cars were you in Avoca ?

But a short time.

While in Avoca, waiting for the cars, where did you stay ?

I might have been in the railroad depot, or at Mr. Gaylor's store, I cannot tell which.

Do you recollect on that occasion of having been in Mr. Gaylor's store ?

I cannot, for those are things which I never tax my memory with, without I am in company with persons with whom I am operating.

Do you recollect on that occasion of having been in the railroad depot ?

I cannot.

How are you able to recollect the fact that you were at Avoca but a short time prior to the departure of the cars, on that occasion, without associating with that circumstance any recollection of the manner of your going to Avoca, or of your staying while there?

Only from the time of the morning that I took the train, and always taking breakfast, with few exceptions, at Mr. Kinzie's before leaving.

Did you set down in your memorandum book the time at which you left upon the cars at Avoca on that occasion?

I did, or thereabouts, about the time.

Did you make reference to that memorandum to enable you to give the answer to my former interrogatory upon that point?

I did.

Did you state before, in answer to another question of mine, and before referring to that memoranda, that you had been in Avoca but a short time before the cars left?

I was looking at the memoranda when you were giving in the question.

How are you able to state that you went to Avoca alone, without recollecting how you went?

I was on business of the nature which I never take any person with me, if I can help it.

How long before you left on that trip to Black Earth, were you advised that you would there meet with this messenger?

I never was advised whether I would meet any messenger there.

What was your destination when you left James Kinzie's at that time?

Black Earth.

Had you ever been there before, and when, if so?

I passed through Black Earth in going out to Clyde.

Did you start from James Kinzie's on the morning of the day that you took cars at Avoca for Black Earth?

I did not; looking at my memorandum book again, I see that I did not.

At what time the day before?

Some time after dinner.

Did you proceed direct to Avoca?

I did.

What time did you reach there?

About 4 P. M.

Are you now able to state how you went there?

I am not, for I have no minute of the fact.

Can you bring no recollection of the fact?

I cannot.

What time did you arrive at Black Earth ?

In the neighborhood of two o'clock.

Did you find Christy Stribble there when you arrived ?

I did.

Did you find anybody else there from Chicago ?

I did not.

Did he deliver to you any written or verbal instructions, messages or advice from any person, and if so, from whom ?

He did, from Mr. Pinkerton.

From anybody else ?

No sir.

Were they written or verbal, which ?

Written.

Will you state them ?

I cannot, for I only read them and act on them at the time.

Can you give the substance of those instructions ?

I cannot.

Did you act upon them ?

I think not.

Why did you not ?

I cannot tell the reason.

If you cannot remember the purport of the instructions, why do you think, and how do you recollect that you did not act in pursuance of them ?

I do not recollect positive, for I have received instructions from Mr. Pinkerton, and I have not acted on some of them, and this might have been one of those he sent me which I did not act on.

Why did you think you did not act upon them ?

Because it was before the time that I had gained but little, if any, information from Kinzie as to this land in controversy.

Did the instructions depend upon the contingency of your having acquired from Kinzie the information you have referred to ?

It did.

How are you able so to state while you say that you have no recollection of the purport of your instructions ?

Because my instructions come from Mr. Pinkerton as I progress.

Was he informed of the progress which you had made up to that time ?

He was not.

Had you communicated with him upon the subject prior to that time ?

I had.

How lately prior to that time ?

About a week.

How frequently had you communicated with him up to that period?

I might have written to him two or three letters prior to that time.

Was there anything in the instructions sent you by Mr. Pinkerton at that time, which, considering the condition of your investigations, conflicted with your views of the most adroit mode of accomplishing the object of your mission, and which induced you to disregard his instructions?

Of course if I did not act on them, there must have been.

Do you recollect that you did not act on them?

I do not.

You still think you did not?

I have no recollection as to that particular instruction.

Do I understand you to say that you still think, as you before stated, that you did not pursue his instructions delivered to you at that time, for the reason before given, that you had acquired but little if any information from Kinzie upon the subject of this land in controversy which you were seeking?

I do so state.

Did you send any report at that time to Mr. Pinkerton by the messenger.

I did.

Was it written or verbal?

It was written.

Where did you prepare that report?

At Black Earth.

State the substance of it.

It was my daily progress, since I had last written to him; I cannot state the substance of that particular report.

Was it dated at Black Earth, or did you advise him in that report that it was written at Black Earth?

I did.

Where was it written, and in whose presence, if in any one's?

The Valley House, I think, is the name of the hotel; there were a number of strangers in the office at the time, and I think Mr. Stribble was also in the room.

Did Stribble read the communication, or did you read it to him at any time?

I did not read it to him, nor did he read it.

Did you have any conversation with him upon the subject?

Not any.

Was Stribble acquainted with the object of your mission, to your knowledge?

He was not.

How long did you remain at Black Earth?

I do n't remember.

Did you remain there over night ?

I did.

Did you leave there the next day?

I do not remember.

Had you any business to detain you there after you had made out your report and delivered it to Stribble ?

I had not.

Have you any means of ascertaining and answering how long you remained there ?

I have.

What means ?

By referring to my report.

Have you any other means, and what ?

None that I know of.

Have you not your memoranda, which you say you kept at the time ?

Part of it; and my report is made from the minutes taken at the time of any occurrences relative to this job or case, at the time they occurred, or immediately afterwards. My memorandums, part of them, I kept in a book, which I carried with me; other parts I wrote on paper and sent them to Chicago, to Mr. Pinkerton.

Can you, by referring to your memoranda, ascertain how long you remained at Black Earth ?

If I had them all with me, I could; I have my report with me, or part of it, which I will refer to, if you wish me to.

Can you, by referring to your memorandum, ascertain and answer how long you were at Black Earth ?

(The witness here produces from his pocket a manuscript roll; the counsel for Bennett interposes the following question :)

Is the manuscript which you now hold in your hand the original memoranda, or minutes, taken and kept by you, as you have alleged you took and kept, of your transactions connected with this enterprise ?

They are not; they are correct copies, and copied by myself.

Where are the original memoranda ?

Part of them are in my desk or drawer; other parts are in Mr. Pinkerton's possession.

Where is that part which has reference to your transactions at Black Earth ?

I may have them in my pocket.

Do you know whether or not you now have it in your pocket?

I do not, relative to that particular question, as to the time I remained at Black Earth.

Did you comprehend my last interrogatory ?

I answered it strictly, as I understood it.

Do you comprehend this the last and one hundred and twentieth interrogatory ?

I answered it as I then understood it, and as I now understand it.

Can you give a categorical and direct answer to the one hundred and twenty-first interrogatory ?

I leave my previous answers to show my understanding of the question alluded to.

Do those previous answers correctly express your understanding of my questions ?

They do.

The one hundred and eighteenth interrogatory is as follows : " Where is that part," (having reference to your original memoranda), " which has reference to your transactions at Black Earth ? " your answer to which was, " I may have them in my pocket." Do you now know whether or not you have in your pocket at this time that part of your original memoranda which has reference to your transactions at Black Earth ?

I do not.

Have you in your pocket now the same memorandum book to which you made repeated reference yesterday upon your examination before the commissioner ?

I think I have.

Do you know whether you have or not ?

Not positive.

How large a book was that memorandum book, in length, width and thickness, as nearly as you can describe it ?

Five or six inches long, three and a half to four inches wide, quarter of an inch thick.

Are you now dressed in a thin, light-colored summer coat and pantaloons, which are made of cotton or linen, and are you without a waistcoat ?

I am.

Have you on the same coat which you wore yesterday upon your examination ?

I have.

Did you have that memorandum book in the breast pocket of that coat yesterday, and did you take it therefrom and return it it thereto, on different occasions, when you made reference thereto ?

I did.

Have you referred to that memorandum book since the close of your examination last evening ?

I have not.

Have you seen it since ?

I do n't know, because the book that I had yesterday was out of my possession from about seven o'clock last evening until this morning, if it be the same book that I now have with me; and I am not able to tell whether it is or not, for I have two or three books just alike in outside appearance, and I have not looked inside this book which I have with me now, since it was handed to me this morning.

To whom did you deliver that book last evening?

To my wife.

Are you certain that you delivered it to your wife?

I am positive.

From whence did you take it when you so delivered it?

My coat pocket.

How then do you say, in answer to my one hundred and thirty-second question, "That you do not know whether you have or not seen that book since the close of your examination, yesterday evening"?

Because I left the house immediately after handing my wife the book, and did not return home until late in the evening, and went immediately to bed. And just before leaving the house this morning I asked my wife for my memorandum book, and other things, which I wished to take down town with me. She gave the book to me, and I put it in my pocket without looking inside of it, and have not since looked inside of it; and I have, on previous occasions, asked her for my memorandum book, and have left the house with the one which she would give me, and upon opening it I would find the book to be quite a different book from that which I wanted.

How soon, after leaving Black Earth, did you make a further report, in writing, to Pinkerton?

I do n't know.

State, according to your best recollection, how long.

I have no idea of the time, whatever, for I never taxed my memory on that point.

How were your communications sent by him other than the one despatched by Stribble?

Sometimes by mail; other times by a messenger.

At what post offices were your communications mailed?

I mailed them. I considered them mailed when I gave them to the mail agent on the cars, or the person I supposed to be the mail agent; and I think I have mailed letters at Franklin, also at Mineral Point, in the post offices.

At what point were your communications delivered to the mail agent?

I have no distinct recollection, only as to one, which I gave to the mail agent, at Spring Green.

How far, and in what direction from James Kinzie's, is Spring Green?

About fifteen or twenty miles, in an easterly direction.

Did you ever deliver more than one of your communications to Mr. Pinkerton, to a mail agent, in the manner you describe, while you were employed in this enterprise?

I am under the impression I have.

Upon what other occasion, and at what place, have you a recollection of so delivering communications?

I have no recollection; I remember of writing letters at Muskada and other places on the line of that railroad, with the intention of sending them to Mr. Pinkerton, in that way, but cannot remember distinctly whether I did or not, for I have, on previous occasions, written letters with the intention of sending them to Mr. Pinkerton in the same way, and I have not sent them, from various causes.

How were your letters and communications to Mr. Pinkerton, which were transmitted through the mails, while you were on this expedition, addressed and superscribed?

To Mr. Hutchieson, giving the number of his box in the post office, Chicago, Illinois.

Did he have a given name, and will you state it?

I have used various initials for a given name; I used no given name in addressing him, but used any initial letter that came to my mind.

Are you acquainted with the course of business in Pinkerton's office respecting the disposition made of the reports from time to time received from his employees?

I am not.

Do you know whether or not your reports, which you state were transmitted to him, were received by him?

I do.

Were they received by him?

He told me so.

Have you ever seen them since you transmitted them?

Some of them.

On what occasion?

At the time of making out my final report.

How soon was that after your return to Chicago?

The next day.

Were all your different reports then handed to you, or delivered to you?

They were not.

Were they subsequently?

They were not.

How many of them were not?

I cannot tell, for they were handed to me as I called for them.

Do you mean to say that they were handed to you one at a time, as you called for them, or how do you mean to be understood?

I mean to be understood that I called for those which I had to make out my final report from, or which I required. I might have asked for two or three at a time, or one at a time; they always gave them to me as I called for them?

Did you, at any one time, have in your possession all of such reports as were at the different times delivered to you?

I did not.

By whom were these reports delivered to you?

By one or more of the clerks in Mr. Pinkerton's office.

Did you refer to them in making up your report?

I did.

Where?

At my desk or table in the building of Pinkerton's office.

Was that desk or table in a room, being one of Pinkerton's suites of rooms?

It was.

Had you, from that room, convenient access at pleasure, to those reports?

I had not.

What obstruction was there to your access to them?

I don't know, for I never made the investigation.

Why do you say you had not convenient access to them, if you know of no obstruction which interposed?

I did not know, nor do I now know where he keeps them.

When you applied for them, and received them from the clerks, and when they were returned to them to be replaced, did you not, at some time, see whence they were taken, or to what place they were returned?

No, I did not.

Did you have a desk in that office specially allotted or assigned for your use?

I did.

Did you keep your memorandums and papers under lock and key in that desk?

I did.

Uniformly?

Except when I was using them.

Had any other person access to these papers, without your permission?

They had not.

Have you been at other times, since you have been in the employment of Mr. Pinkerton, engaged as a detective officer at

other and remote places, where you kept memorandums of your transactions, such as you have related you kept on the occasion of your visit to Mr. Kinzie?

I have.

Have you kept, on these several occasions, separate memorandum books, devoted exclusively to the record of each particular job?

I have not.

Have you preserved those memorandum books?

Part of them.

Where are they now?

Part of them at my house, and I think I have one or two in my desk.

How many of them have you altogether, according to your best knowledge?

I do n't know.

What is your best belief?

I have no idea at all, for when I come in from any country job, I copy my minutes into a report, and after making out my report, I either destroy the book or a part of it; and sometimes I throw them in my desk and lock them up.

What object have you in ever destroying any part of your memorandum book, and preserving the balance?

Because they encumber my drawer; and, sometimes, the parts that I preserve belong to separate matter, and I had not time to copy them at that time.

Is it therefore that you destroy them?

It is; and another reason is, because I have a report in my own hand-writing, which I can refer to for any specific object.

When you have such report, is there any object in preserving or retaining any portion of the original memorandum?

There is not; for those that I do retain, it is my own neglect in not destroying them, for I generally do when I have them copied.

Have you destroyed any part of the original memoranda of your transactions on the occasion of your visit to Mr. Kinzie?

I have.

When?

As I was copying them in my final report.

Have you not before stated that that which you call your final report, was copied and made up yourself from the several reports and communications transmitted by you to Mr. Pinkerton, at different times, while engaged in this service?

If I did, I meant from those which I had in my possession, and those which I had sent to Mr. Pinkerton, all combined.

Was there any difference between the facts stated in your

original memoranda, and those embodied in the reports sent to Mr. Pinkerton ?

The memorandums which I had with me, sometimes I copied them or parts of them, and if the original memorandum had been taken on sheets of paper, I would send them in that shape to Mr. Pinkerton. There was no difference in those facts which I copied. Those which I sent on sheets of paper, as the original memorandum, I kept no copy of them myself.

Did you send to Mr. Pinkerton reports of any material facts which came to your knowledge, of which you had and kept no written memoranda in your memorandum book ?

I did.

Will you state one such material fact ?

My trip to Mineral Point, and back.

On which occasion or trip ?

The time that Kinzie had the most conversation with me about the eighty acres of land in Chicago.

Did you write, and send that communication from Mineral Point ?

I wrote part of it at Mineral Point, and part of it after I returned to Clyde ; and I am under the impression that I brought it, and left it at Mr. Pinkerton's office myself.

Upon what occasion did you bring it and leave it ?

I wished to be away from Kinzie's for a few days, so I came to Chicago.

By what route did you come to Chicago ?

I think I came on the Milwaukee and Mississippi Road to Milton, then to Janesville, and from Janesville to Chicago ; that is my impression.

How long were you absent from Clyde at that time ?

Three or four days.

Did you see Mr. Pinkerton while in Chicago ?

I think I did.

Did you deliver to him your report ?

Either to him, or some of his clerks.

Did you have an interview, or any conversation with him, upon the subject of your transactions, during that visit to Chicago ?

I do n't remember.

Did you, with any person, have such an interview or conversation ?

I did.

With whom ?

I do not remember.

Can you recollect the name of any person with whom you conversed on that subject, while in Chicago ?

I cannot.

How long were you in Chicago at that time?

I think I came in one evening, and left the next morning but one following.

Did you see Mr. Henry Waller during that time?

I did not.

Did you receive any money before you left Chicago, at that time, or any certificates of deposit, drafts, or bills of exchange?

I did.

From whom?

Either from Mr. Pinkerton, or Mr. Lawrence, a clerk at Pinkerton's.

How much did you receive?

Between $500 and $600. I think that was the time I received it.

In what form?

Five hundred dollars in gold; balance in paper money.

Did you receive any instructions from Mr. Pinkerton, before your departure from Chicago, on that occasion?

Now, I have refreshed my memory, I think it was Mr. Pinkerton himself that I saw, and if I did see him, I received instructions from him.

What has refreshed your recollection in this regard?

The amount of money which I received.

Did you not before know and remember that you had on that occasion received that amount of money?

I did not.

Do you now remember that that money was paid to you by Mr. Pinkerton?

I do.

In answer to the one hundred and ninetieth interrogatory, do you now say that you know you saw Mr. Pinkerton on that occasion?

I do.

For what object did you receive that money?

For the purpose of securing part or the whole of Mr. Kinzie's farm, and an interest in his interest in the Chicago eighty acres, involved in this controversy.

Was it in pursuance of the understanding and agreement which you related had been made between Kinzie and yourself, for an interest as described by you in the property in question?

Sometime before that I received the money; sometime before Kinzie and I made the agreement I received the money.

Did you, then, before leaving Chicago on that occasion, contemplate purchasing and obtaining from Kinzie a conveyance of any interest or pretended interest in this property?

I did.

Did you receive any instructions from Mr. Pinkerton, or any other person, written or verbal, to accomplish that object, if possible?

I did, verbal, from Mr. Pinkerton.

Did your instructions direct or advise you as to the disposition of the money, as to how much should be paid upon the farm, and how much for the purchase from Kinzie, of his pretended interest in the property in Chicago?

They did not.

State fully, as near as you can recollect, then, the instructions that Mr. Pinkerton gave you on that occasion.

He gave me the money, and told me if I thought I could accomplish a trade with Kinzie, to do so, and get his farm as low as I could; likewise whatever share of his interest I might buy; and to be sure that, if I did buy the farm, to have the bond made out right, and acknowledged; and if I bought an interest of Kinzie in his interest in the Chicago eighty acres of land, to get a written agreement, and to have that also acknowledged; and if I was successful, to send that agreement to Chicago to him by the first opportunity. That is about the purport of his instructions to me.

Was any arrangement at that time made by which you were to be supplied with further sums of money, in any contingency?

There was.

Will you state what that arrangement was?

The arrangement was, that he, Mr. Pinkerton, would dispatch a messenger to me with certificates of deposit on some bank in New York.

Why on some bank in New York?

Because I hailed from there.

Had you stated to Mr. Kinzie, and to others in the neighborhood where he resides, that you were expecting certificates of deposit from New York?

Yes, I had told Mr. Kinzie, either before or after my visit to Chicago; I am under the impression, after my visit to Chicago.

Did you tell Mr. Kinzie that you had been to California; that you had been successful there; that you had made, and then possessed, twelve thousand dollars; that your father resided in New York, where he was engaged in business as a ship chandler; that you had left with him, or that he had deposited for you, your money; that you had a brother who had and was possessed of ten thousand dollars; that together you had twenty-two thousand dollars, which you were desirous of investing in land, if you could find good locations; that your father had been through that country in 1838; that he wanted you to go there and purchase; that your father had built, or had, six

brick houses, in New York, for his children; that as fast as one got married, he gave them one of the houses; or tales to the effect of the above?

I told him all that, with the exception of the time that my father passed through that country; the time I gave him of my father passing through that country was 1836; also, the number of buildings I gave him was four instead of six.

Was it false, that your name was Peter G. Roe; that you went there to buy land for yourself or brother; that you had made, in California, and possessed twelve thousand dollars; that you had just then come from New York; that you resided in New York; that your father and three brothers resided there; that he was there engaged in the ship chandlery business; that he had received and deposited, or held for you, twelve thousand dollars of your money; that he wanted you to go to Wisconsin and purchase land; that he had built four brick houses for his children, one of which he gave to each child when married; that your money was in Bank in New York; that you were expecting certificates of deposite sent to you by your father; that your brother had ten thousand dollars; that he was desirous of buying lands in that neighborhood; and that you desired to buy for him as well as for yourself; that together you wished to invest the twenty-two thousand dollars in lands in that country?

It was.

Did you tell any of these tales to other people in that neighborhood or country?

I think there were a number of persons by, at the time I was telling Kinzie.

Did you ever narrate any of the above stories to other persons in that neighborhood, when James Kinzie was not present?

I think I have.

Did you make false representations concerning yourself uniformly, while in that country, when you had occasion to make any representations concerning yourself?

I did, wherever I thought it would be an assistance to me to accomplish my purpose with James Kinzie.

Have you any distinct recollection of ever having, on any one occasion while in that country, spoken truthfully, where you could help it?

I always told the truth, when it would answer as well as a falsehood.

Did you find any occasion, while you were there, when you thought the truth as subservient to your purposes as falsehood, which you now distinctly recollect?

Frequently.

Did you become acquainted, while in that country, with a man by the name of Bigelow; if yea, where and how far from James Kinzie's did he reside?

I did; I was introduced to him by James Kinzie as his particular friend; he lives about two miles from James Kinzie's.

Did you become acquainted with the fact, while there, that he owned a large farm, was wealthy, and one of the most reputable and worthy citizens in that part of the country?

I became aware, through James Kinzie, that Mr. Bigelow was in possession of about 700 acres of land, but it was involved by some railroad stock, which, if paid, there would not be much of the farm left to Mr. Bigelow; I have heard some speak of him very highly, others very degradingly.

Did you learn while there, that his family were held, in that community generally, in very high repute?

I did not.

Did you represent yourself to a daughter of Mr. Bigelow as an unmarried man?

James Kinzie introduced me as such.

Please to state in what phrase, as near as you can recollect.

He introduced me as Peter G. Roe, and that I had been traveling all over the country, and had not got a wife yet, and he, James Kinzie, intended to marry me off to some of the girls around there, before I had been in that county long.

Did you frequently visit the family of Mr. Bigelow?

I have been there several times with Mr. Kinzie, and with his son Robert, and other persons in that neighborhood, and I have been there alone.

Did you represent to Mr. Kinzie that you were an unmarried man?

I did.

Was that false?

It was.

Was that falsehood necessary to the furtherance of your object?

It was very essential.

Please to state how.

Why, when I went out there first, I did not know how long I was to remain there, and country people generally wonder, if a man tells them he is married, why he don't receive letters from his wife, or some of his family, or why he should stay there so long without writing to his family; they also wonder why he don't purchase, or go to work, instead of lying round, or running over the country spending money.

Did you not allay that wonder, and satisfactorily account to the wondering community for all this which you have given as

a reason for your false representations, by your pretended and assiduous efforts to buy lands, select locations on which to settle yourself as well as for a home for your brother; and did you not seek further to allay such inquiries of the curious, by repeated declarations that you were expecting letters from your friends, your father and your brother, and at other times that you had received such?

When I told James Kinzie that I was a single man, it was either on the first or second night after my arrival there, and I was telling him of my trip in California, and the narative of the same. I told him that I was gone about six years; when he, or some of his family, said, that was a great while for a man to be away from home. I told them my home was in any country which I liked, for I had no family, nor no one else to look after but myself. He said, that is the way that a man ought to be that had a roving disposition, like he had when he was young, and supposed that I had.

Had you resided in California six years, away from your family?

I had not.

While you were in Iowa county, did you become intimately acquainted with a daughter of Mr. Bigelow, before referred to?

No more so than with other ladies in that vicinity.

Did you frequently ride out or drive with her?

I have been out with her on three or four different occasions, once in the company of James Kinzie.

How did you go on that occasion?

Horse and wagon.

Where did you go to?

Avoka and Muskada.

Whose horse and wagon did you drive?

One that I bought.

Did Mr. Kinzie go with you the whole trip?

I think he did.

Can you refresh your recollection and say whether you know that he did or did not?

He was in Muskada with me and Miss Bigelow; that was as far as we went; it was the end of the trip, and he must have returned home with us, for he had no conveyance of his own there.

About how far is Muskada from Mr. Bigelow's?

About twelve miles.

Had your wagon two seats, or only one?

Our wagon has two seats attached to it.

What do you mean by two seats attached to it?

I bought two seats with the wagon, and I suppose they were built the same time the wagon was.

Were both seats in the wagon on that occasion?

I don't remember whether the seats which I bought with the wagon were both in the wagon at the time, for I have used a piece of board on different occasions, instead of one of the seats, and I might have done it on that occasion.

Did Miss Bigelow ride out with you on more than four occasions?

She might have done so, for I used to take most any of the ladies, in that neighborhood, to places which they wished me to, at any time that I thought best to do so.

Do you know that you rode out with her more than four times?

I do not, for I kept no account of all my rides out with different ladies in that neighborhood.

Did she go to Mineral Point with you?

I passed through Mineral Point with her.

Did she ever go to Grant county with you?

Not to my knowledge; we might have passed through some part of Grant county on the trip spoken of.

Is Mineral Point in Iowa county, or do you know that Mineral Point is in Iowa county?

It is the county seat of Iowa county; so I have always been told by James Kinzie and others, and believe it to be so.

About how far is Mineral Point from Mr. Bigelow's?

Twenty-five or six miles; I have heard various statements as to the distance.

Did you ever go to Avoca with Miss Bigelow?

I have passed through Avoca, and stopped I think, at Avoca, on the trips previously spoken of, when James Kinzie was in my company.

Did James Kinzie go to Avoca with you and Miss Bigelow?

I think that we stopped at Avoca, and James Kinzie was in the company of Miss Bigelow and myself on the trip previously spoken of.

Did James Kinzie go with you and Miss Bigelow to Avoca?

He did, on the trip spoken of.

Did you ever go to Avoca alone with Miss Bigelow?

I did.

Did you ever go to Lone Rock with Miss Bigelow?

I did; she wished to mail and receive letters at Lone Rock Post Office, that she said she was expecting from some of her relations in Chicago; and also to stop at her sister's on the way going to Lone Rock, and coming back; she living on the road leading to Lone Rock.

What is that sister's name?

Hurst, I think they pronounce it.

How far is Lone Rock from Mr. Bigelow's ?

Five or six miles by the road which we went, and I know of no other road to go with a horse and wagon, as near as the one spoken of.

Do you know a Mr. Young, a brother-in-law of Miss Bigelow's, and where does he reside ?

I was introduced to him by James Kinzie.  He resides near Belle Mound, I think Lafayette county.

Did you ever go with Miss Bigelow to Mr. Young's ?

I took her there on a promise of a previous request she had made of me to take her there.   When I did take her there, it was on the occasion of the trip passing through Mineral Point, as spoken of before.

Did you ever give out or intimate to any person in the neighborhood of Mr. Kinzie, that you had contracted an engagement of marriage with Mrs. Bigelow ?

No, Sir; they were always a joking with me whenever I might be in company with Miss Kinzie, the daughter of James Kinzie, Miss Bigelow, or any other lady in that neighborhood, about living an old bachelor's life.   I have told them on different occasions when they have been joking with me as to getting married, that I would get married as soon as I found any one to suit me.

Did you give them to understand that you were going to be married to Miss Bigelow on the 4th of July, and did you invite them all to be present ; in effect, telling them that they must all come down to Mr. Bigelow's on that occasion?

I remember a conversation that took place at Mr. Young's, the brother-in-law of Miss Bigelow, between me and Mrs. Young; Mr. Kinzie was there at the time.   Mrs. Young asked me if there was going to be a ball on the 4th of July ; she asked me who I was going to take with me.   I told her I did not know where I would be on the 4th of July, for her father, Mr. Bigelow, had been talking to me about going to Prairie du Chien, as soon as he got through with his planting and other work, which he was then at, and I might spend my 4th of July with him at Prairie Du Chien.   She asked me if her mother was going along, and also her sister, Vandalia.   I told her they might both go, but I did not know, for I had heard her sister say that she would like to go to a ball at that time, if there was any in the neighborhood ; so I could not tell her where I would be on the 4th.   I asked her then, where she was going to spend her 4th ; she said she did'nt know, but she had been trying to get her husband, Mr. Young, to take her home or in that neighborhood. I told her she must make him fetch her to Otter Creek to spend the fourth, and if I was there, we would have some sport of some kind.   She said, I would bet that you and Vandalia are

going off to get married somewheres on the fourth, and if you are, without letting me know, I will never forgive you. I told her I would let her know before anything of that kind came off, but she must come up on the fourth. James Kinzie then said, I am going to marry Roe myself when he does get married; he also said, you know I can do it, Mrs. Young, for I married old Doctor Frost, on Otter Creek, to his wife.

Was James Kinzie a magistrate?

I saw him act in that capacity, and have always understood since I made his acquaintance, that he was elected by the citizens of that town as a magistrate.

Was the conversation narrated by you, with Mrs. Young, before or after the occasion of your visit there with Miss Bigelow?

After.

Did not Mrs. Young then understand that you were, upon the 4th of July thereafter or thereabouts, to be married to her sister?

I do not know what she surmised.

Did you not understand that she was under that impression? I did not, for I have heard such like conversations about me and Miss Kinzie by the neighbors in that vicinity. A man by the name of Newply, I think they called him, stopped me one day when passing his house, and told me that it was all round the neighborhood that I had come there for the purpose of running away with her.

Did you give Mr. James Kinzie, Robert Kinzie, son of James Kinzie, and Margaret Kinzie, and Daniel Kinzie, a nephew of James, to understand that you were to be married to Miss Bigelow?

I did not; they have frequently joked with me about Miss Bigelow and other ladies in that neighborhood, in the presence of Miss Bigelow at Kinzie's house, and Miss Bigelow herself would join in the mirth, and tell them that she was going to live in that fine house that I spoke of building on Otter Creek.

Now, Sir, did not Miss Bigelow herself understand that you intended marriage with her?

She could not have done so, for on several occasions she has asked me for my daguerreotype, and I have always refused giving it to her.

Did you not promise her marriage?

I did not.

Did you ever make declarations of affection for her, to her?

I have told her that I thought Margaret Kinzie was the finest young woman on Otter Creek, for she had always conducted herself as such since I had known her. But I did not care about any young woman, only, I liked to be in ladies' society;

therefore I know well that I have not to her nor no other young lady in that country, made declarations of affection or love, to any one, excepting in the way of a jest, when they have been a-joking with me on that subject.

Do you state on oath, Sir, that you never expressed with apparent sincerity, any special and affectionate regard for Miss Bigelow, to herself?

I do.

Did you have her daguerreotype?

I did.

Have you it now?

I have not.

Did you bring it away from that country with you?

I did.

Do you know that it was currently reported and believed in the neighborhood where Miss Bigelow resided, that you were to be married to her?

It was reported by some that I was going to be married to Miss Margaret Kinzie; by others, to Miss Vandalia Bigelow; and it was reported by others that the widow Lisburan, the daughter of Mr. See, James Kinzie's father-in-law, would catch me, as I used to ride out with her; as to their belief, I know nothing of it; I understood it all as a jest, for James Kinzie, himself joked more on that subject than any other person in the neighborhood.

Now, Sir, answer me, did you not make propositions tantamount to proposals of marriage; and did you not make declarations of love and affection, also, to Miss Margaret Kinzie; and were they not, or some of them, reported to her mother, and by her rejected; and thereupon, or shortly thereafter, did not Miss Margaret leave home and go to teach school somewhere?

I did not make any such proposal, nor do I know what the reports were to Mrs. Kinzie; but I know well that Margaret Kinzie, herself, also her father, James Kinzie, told me, when I first made their acquaintance, that Margaret Kinzie had an engagement to teach school in a school-house at the school district then erecting; and I also know that Margaret Kinzie went to this same school-house spoken of, to teach school, and boarded at Dr. Frost's, within a short distance of the school-house, for I have called on her as I have been passing by, at the school-house, also at Dr. Frost's.

Did the success of your enterprise, in your judgment, involve the necessity of a violation of the rites of hospitality; the enlisting the affections and interest of the ladies of the families whose hospitality you were thus abusing; the subjecting those ladies to the mortification of public scandal; and to the reputa-

tion of having been betrayed and deserted by one who was to subsequently reveal himself as an impostor ?

The success of my enterprise depended materially on my being friendly with all James Kinzie's friends, and an enemy to his enemies, which I carried out, but always conducting myself as a gentleman, when in any ladies' company ; nor have I offered the slightest insult, or used any language unbecoming a gentleman while in their company.

Your mission, in your judgment, involved, did it not, a violation and abuse of the rites of hospitality, together with a systematic course of deceit, falsehoods and misrepresentations ?

I do not know that I have violated any rights of any one's hospitality to me ; it was highly necessary to use deceit to accomplish my object, and I used it as such.

When you went there a stranger, and met Mr. Kinzie, you were kindly received by him, and hospitably entertained, were you not ?

I was.

You went for the purpose of deceiving and betraying him if possible, did you not ?

I went there for the purpose of getting all of him that I could relative to this Chicago eighty acres of land, and report the same to Mr. Pinkerton.

Did you go with the purpose of deceiving him ?

I did.

Did you go with the purpose of betraying him, if you were successful in your deceptions ?

I did.

You are engaged in such business for seventy-five dollars a month, are you ?

Or thereabouts, I have never divided it into months.

Do you consider yourself amply compensated for such services by that price ?

I do not, but I have agreed to work for that price, and I intend to fulfill my agreement.

How much would you consider an adequate compensation, and with how little would you be satisfied for such services ?

It is owing to circumstances altogether.

Such as what ?

Parts of the country, and location of the country, and the character of the job in which I would be about to enlist in.

Instance a country and a job such as the one in question ?

I do n't know what I would enlist for ; I would have to give it some consideration.

How much would you consider a fair compensation, such as

you would be satisfied with? Give it such consideration as will enable you to answer the question.

From a thousand to fifteen hundred dollars a year.

Have you been conscious of experiencing any sentiment of remorseful regret or self-degradation while reflecting upon the nature of your transactions, and the complication of misrepresentations, falsehood and deceit in which it involved you ?

I have not.

Do you consider fifteen hundred dollars a year a fair and reasonable compensation for a man of your physical and intellectual capacity to sell himself as a common impostor; and to devote himself to the business of misrepresentation and falsehood as a profession ?

I do, where they do it to further the ends of justice.

Was that your object in engaging in a business of this character, or did you engage in it as a means of livelihood ?

I was engaged in the same kind of business before I made the engagement with Pinkerton, with the exception that I was paid by the public, to further the ends of justice; and I engaged in this business with Pinkerton with that understanding ; and I have always found, since I have been in his employ, that to be his object, for he has never instructed me otherwise.

Did you engage with Mr. Pinkerton in this business at $900 a year for the purpose of furthering the ends of public justice, or as a means of livelihood ?

Both.

Did you engage at a less compensation than you have said would be in your opinion a fair remuneration for services of the character you have rendered on this occasion, in consideration of the fact that you would be forwarding the ends of public justice ?

I did not; I engaged with Mr. Pinkerton more on account of moving out West than anything else.

More than to gratify your disposition to advance the ends of public justice ?

I consider that I was furthering the ends of justice while in New York as much as I am here at the present time, taking in consideration the opportunity I had for so doing.

Has public justice ever done you a turn which has had the effect to make you so solicitous for her protection, and so self-sacrificing and earnest in her behalf ? .

Yes, at several different times.

Was it in consequence thereof that you became so interested in her behalf?

I found, during my public life, the more public good I could do, the better it was for myself, and all those connected with me.

Has that been your experience also with reference to your private life?

It has, for I have never been employed in my life, by no man, but I could go back to him any time when out of employment, and get employment from him.

Will you now take from your pocket the memorandum book which is there, and refer to the minutes of your transactions, and see if you can answer the question which I have put to you in the 106th interrogatory, to wit: How long were you at Black Earth?

I will. (Witness takes memorandum book from pocket, refers to it, and says, in answer to 106th interrogatory, as now given:) I arrived at Black Earth on Thursday, the second of April, about 12.30 P. M., and remained till Friday, the third, about 3.30 P. M.

Did you return from Black Earth, on Friday, to Clyde?

I think not.

Will you state where you went, and when you returned to Clyde?

I am under the impression I stopped at Avoca, at Mr. Gaylor's, during Friday night, and went to Kinzie's the next morning.

How soon after your first arrival at Clyde, did you leave there on any trip, and where did you go?

On Tuesday, the 17th of March, I went through a part of Iowa county and Grant county, as I was told I was in.

How long were you gone?

I returned on the Saturday following.

How did you go, and with whom, if anybody?

I went part of the time a-foot, and part of the time on horseback, and alone.

To what place in Grant county did you go?

I was told Wingville, to which place I went, was in Grant county.

What was the object of your trip to Wingville?

I had no object to go to Wingville, more than any other place.

What was your professed object?

To go out on the prairie, and look at lands, as Mr. Kinzie advised me to do.

Did you buy any land, or contract to buy any land, at that trip?

I did not.

Did you see a Mrs. Cox in Grant county?

Not to my knowledge.

Did you see a Mrs. Cox anywhere on that trip, after you left Kinzie's, and before your return?

Not to my knowledge.

Did you represent to Kinzie and others, after your return from that expedition, that you had contracted to purchase Mrs. Cox's farm, consisting of 160 acres, for which you had agreed to pay $2,400; that you had paid Mrs. Cox $100 down, and agreed to pay the balance on the 9th of May following; and did you exhibit a bond, purporting to be signed by the name of Cox, with the certificate of acknowledgment annexed, purporting to be signed by a magistrate? Did you state that you could have paid them $500 or $600 more; that you had not a great deal of money with you, but that you did not wish to be entirely out of money; that you might wish to secure other purchases elsewhere?

I told Mr. Kinzie all this, and showed him an article which I had written myself.

Did you write the signature to that article?

I did.

And did you write and sign the acknowledgment and signature to the same?

I did.

Was that whole statement false and manufactured, and the signature forged?

The whole statement was false, but the signature I don't consider forged, for I did not know any magistrate or any one else in the neighborhood which I represented to buy the land in.

Do you not know that there was a man by the name of Cox residing in Grant county, and that there was a magistrate bearing the name which you employed in the certificate of acknowledgment, and who was known to Kinzie?

I did not know, nor do I know at this present time, any such man, nor do I believe James Kinzie did, for he told me so when I showed him the article; he said he was not acquainted in that neighborhood.

Will you state the name of the magistrate which you employed?

I cannot, for I put the first name down that came to my mind, both in the case of Cox and magistrate; nor do I now know whether it was Cox that I used the name of, or not, for magistrate, or the person I bought from.

What became of that bond?

I destroyed it.

When?

Sometime after showing it to Kinzie.

How long after showing it to Kinzie?

I have no idea.

Do you remember destroying it?

I remember one day, while in the woods, looking over some papers which I had in my pocket, for the purpose of destroying

those which I did not wish to have about my person, or to be encumbered with, I missed this article spoken of, and I supposed I had destroyed it, so I gave it no farther consideration.

When you first went to Kinzie's house, you say it was afternoon; did you tell him that you had come up through the mills from Avoca, and that you had walked most of the way?

I did.

Did he reply, in substance, that you had not seen any taverns on that road, and ask you if you had had any dinner; and did you reply that you had not, and that you were hungry; and did he then invite you into the house and give you some dinner?

He invited me into the house to get a drink of water, when he saw me in the act of going to the creek for it, and after, in the house, he asked me if I would have some dinner got for me.

Did you not, before going into the house, while at the mill yard, where you first met Kinzie, make the representation respecting your means, your father, your brother, your residence in New York, and your object in purchasing lands in the country?

I told Kinzie in the yard, that I came out in that country for the purpose of looking up lands, but the conversation about my father and brother occurred in the house, to the best of my belief.

After dinner did you ask Kinzie if there was any place thereabout where you could get to stay all night, and perhaps a couple of days, as you desired to look about, and see if you could find any place that would suit you to purchase?

I did, or something to that effect.

Did you tell him that your brother had gone, or was about to go, to Kansas, to buy land; that if he had gone, he had probably returned by that time, and if so, you expected he would bring your money to you?

I told him that I expected my brother had gone to Kansas, and would meet me at Madison, in four or five weeks, and if I made a purchase, I should write home, and he would bring out money to me.

Did you ask him, the day you left to go to Grant county, if he thought you would be able to buy any land at Otter Creek? Did he reply to you, in substance, that if you had money enough, any one would sell to you; that you could buy the whole country; that if his place suited you, he would sell as well as the rest; and did you say that you had not much money with you, as you did not like to travel with much money in a strange country; that you had brought with you six or eight hundred dollars; but if you bought, you could get your money in thirty days?

Something to that effect took place on the morning that I left Kinzie's house to go on the prairies south of Franklin, as he directed me; this was the time that I went to Wingville.

After your return from Grant county, how long did you stop at Kinzie's house, before making your next and second excursion in the country?

I do n't remember; some few days only.

Do you remember, was it more than two days?

I am under the impression that it was Monday or Tuesday of the first of the week following; but I have no distinct recollection as to the time.

Where did you go to on the second expedition?

Jonesdale, I think.

How long were you absent at that time?

Some two or three days.

Do you recollect, were you not absent four days?

I might have been; I was away so much that it is impossible for me to remember as to the time that I was away on different occasions.

Did you stay at Jonesdale all that time?

I am under the impression that I went to Spring Green on that trip, in the neighborhood of twelve miles from Kinzie's.

Did you go afoot?

Part of the way; part of the way I rode in a wagon.

What did you go to Spring Green for?

I went to mail the letter spoken of in a previous answer, the one I gave to the supposed mail agent.

What did you tell Kinzie was your motive?

To look at the country.

With what object?

With a view of purchasing land, or to leave that impression with him.

After your return from Spring Green, how long did you remain at Kinzie's before taking your departure upon your third expedition, and where did you go to?

I am under the impression that I went to Franklin, in a few days after I returned to Kinzie's; Franklin is about eight or nine miles in a westerly direction from Kinzie's.

Did you not go to Franklin the second day after your return from Spring Green?

It might have been the second day.

Did you go on foot that time?

I do n't remember, for I have been in various ways to Franklin—sometimes a-horseback, sometimes in the mail wagon, sometimes part of the way on foot, then rode the other part with teams going to Franklin.

What was your professed object in going to Franklin at that time ?

I have told Mr. Kinzie various objects for my going to Franklin. I do not remember what I told him on that occasion.

What was your real object for that visit ?

I do n't remember.

How long were you absent on that visit before your return to Kinzie's ?

Do n't remember. I might have returned the next day, or I might have staid there until the next day but one, and then returned.

Do you recollect, were you not absent at that time three days, one of them being a Sunday ?

I do n't remember of ever stopping at Franklin on Sunday.

Did you go anywhere else than to Franklin on that trip, and did you not spend that Sabbath elsewhere than at Kinzie's ?

I think not, for I am under the impression that I spent part of that Sabbath at the school-house, near James Kinzie's, in the company of Miss Margaret Kinzie, Robert Kinzie, her brother, and others.

Were you at James Kinzie's at any time prior to the April election, more than two days at a time ?

I think I was.

Can you recollect between what excursions you were there more than two days at a time ?

I do not remember the excursion which I returned from, but I do remember returning from one, on Saturday, about the middle of the day, and the election came on the Tuesday following. The reason I remember this so distinctly is, that James Kinzie, Daniel Kinzie and myself made out the democratic ticket on Sunday following the Saturday which I returned on, and Sunday afternoon James Kinzie, Daniel Kinzie and myself went through part of the neighborhood electioneering for the ticket headed James Kinzie, chairman of the board of town supervisors; also on Monday we were around electioneering, and on the following Tuesday, James Kinzie went to the place which was designated for holding the election, and told me to attend to the outside affairs, and bring the men to the polls, for he had to attend to the ballot-box.

After this election, did you request Mr. Kinzie to draw up for you a petition for postmaster of Clyde, in the place of the present incumbent, who was represented to be a republican or whig, declaring your purpose of locating and residing at Clyde ?

I did not. I proposed sending a petition to Washington, and have the postmaster removed, and have Daniel Kinzie appointed in his stead; and there was a petition drawn up to that effect.

In a short time afterwards, James Kinzie told me that the democrats of Clyde would be better satisfied for me to have it, on account of what I had done for them at that election, and he said that I must have it. I told him, if I lived there, I would not be bothered with it, for I would be away from home so much. He said, get the appointment, and then, any time after, you can give it to any one you please. I told him I would accept the appointment, and if I got it, I would give it to Dan. Kinzie. He then drew up a petition himself, and used my name as the applicant; and the next I saw of the petition, James Kinzie showed it to me, with nearly all the democrat names in that neighborhood attached to it, and said I should be postmaster in a few weeks, for he would see Judge Strong and others, to push the matter through, for the present postmaster, Mr. Norton, was a damned Shanghai.

Did not James Kinzie decline to draw up a petition in your favor, and for the removal of the then incumbent?

He did not—it was his proposal. He said that he could draw up a better petition than the one which had already been drawn up for Daniel Kinzie. He knew more of the difficulties which persons were laboring under, a-going to the present postoffice, for their letters and newspapers, which he did set forth in the petition he wrote for P. G. Roe, applicant.

Did you not, after Kinzie had declined to draw your petition, go to L. M. Strong, probate judge of the county of Iowa, and get him to draw your petition, and afterwards, under the plea that the writing was poor, ask and procure James Kinzie to copy it—saying, substantially, that he could write better than you could; and did not Kinzie, on your request, copy the petition, which was circulated, and signed on your behalf?

I saw Judge Strong in Franklin, and we were talking on political matters, and the postoffice arrangements came in, in the way of general conversation; and I told him that James Kinzie, and other democrats in Clyde, were talking of getting Norton removed. He asked me if they had a man for the place. I told him Daniel Kinzie was spoken of, and asked him if he would draw up the petition. He said he would, but I must not let any one see the writing, for he had some private matters in that neighborhood, which it would interfere with. We then went to Judge Strong's office, in Franklin, or one that I supposed to be his office, and he drew up the petition—Daniel Kinzie, applicant; and that was the petition which I asked James Kinzie to copy, as I read it, so that Judge Strong's handwriting should not be exhibited, when asking persons to sign the petition. Those were the reasons which I gave James Kinzie at the time.

Why did you go to Judge Strong to draw that petition ?

I did not go to him to have him draw it. It came in, in the way of conversation on other matters. James Kinzie had introduced me to him sometime previous to this, and told me he was the best democrat in the county ; and also had told me that he would speak to Judge Strong, and see if he could get Norton removed.

Was that after Kinzie had told you that the democrats of Clyde would prefer you to Daniel Kinzie, as their candidate ?

No—before.

Was not the petition in your favor, substantially a copy of the petition drawn up by Judge Strong, in favor of Daniel Kinzie ?

Quite different. I think I have both the petitions yet in my possession, in my desk.

Did you not deliver or send the petition, which was circulated in your behalf, which was in James Kinzie's hand-writing, to Mr. Henry Waller, or to Mr. Pinkerton ?

I either sent it to, or gave it to Mr. Pinkerton, myself, or Mr. Lawrence, I do not remember which.

Was that before or after your final return from that country ?

I am under the impression that I either brought it in or sent it, before I left Wisconsin for good.

What disposition did you represent to James Kinzie, and others in that neighborhood, that you had made of that petition ?

I told them I had sent it to Washington.

Now, Sir, was that other than a scheme, devised by yourself, as calculated to fortify and give color of truth to the statements which you had made, were making, and contriving to make, respecting the progress you were making, and had made, in securing the confidence of James Kinzie, and to impose upon the credulity of the complainants in this suit, and your employers, with the belief that they would more easily credit the statements which you had made, and designed making, of the manner and circumstances, and means employed by you to accomplish the material result of procuring from James Kinzie, a conveyance of the character designed by you, of his pretended interest in the property involved in this controversy ?

It was no scheme of mine ; it was a proposition of his own, and I am under the impression that the petition was written after the date of the agreement made between me and James Kinzie, relative to the interest in the 80 acres of land ?

If you had accomplished this main object of your mission, how did it further the ends or the interests of public justice, in your judgment, thus to impose further upon James Kinzie, and upon the democracy of the town of Clyde, by the false pretense

that you were going to accept the office of postmaster, and that you had sent forward their petition to Washington?

My object was not accomplished until about the 19th or 20th of June last.

What further object had you than you had already accomplished, when you procured the signature of James Kinzie to that paper, purporting to convey an interest in this property?

To get him before the commissioner, to take his last deposition.

To accomplish that object, was it material that you should continue to make false representations, and to impose further upon the credulity of the democratic party of the town of Clyde?

It was.

Did you accompany Daniel Kinzie when that petition was circulated, soliciting signatures?

The petition was nearly full when James Kinzie, in company with Daniel Kinzie, showed it to me; and one day after that, Daniel Kinzie took it with him when we were going to some place, and said he had one or two more names that his uncle wished to have on the petition, and as we were going by their places, he would get them to sign, and I think he took the petition, and got their signatures.

Were you with him when those signatures were obtained?

I think I was.

Do you know you were?

Not positive.

How do you so well remember the particulars of the conversation as to what James Kinzie said, and Daniel Kinzie said, so as to rehearse the same so minutely, and yet forget the main fact so immediately connected with, and resulting from, that conversation?

I always made a minute, or committed to memory, any occurrence touching this case, that took place in James Kinzie's company.

Did you make a minute of that conversation?

I think not.

Did you go out on any other occasion with Daniel Kinzie, soliciting signatures to that petition, than on the occasion last referred to?

The petition was in James Kinzie's or Daniel Kinzie's possession for some time, and both or either of them might have got signers when I was in their company, but I do not remember seeing any one sign the petition except on one occasion.

About how many of the signatures to that petition were an-

nexed in your presence, or when you were in company with Daniel Kinzie?

I have no idea, for I did not trouble myself about getting signers to the petition.

Were you not with Daniel Kinzie when every single name which he procured to that petition was annexed to it, and did you not accompany him on every occasion when he went to procure the signatures through the town of Clyde?

More than three-fourths of the names on the petition were on it when James Kinzie first showed it to me, after the day it was written. I was with him, Daniel Kinzie, on two or three occasions when he has spoken of the petition, and said that he intended to get so and so to sign it; I don't remember the names; I am under the impression that he got Mr. Bigelow to sign it one day we were out.

Did he not go out in your wagon with you on several occasions through different parts of the town of Clyde, getting signatures to that petition?

I am under the impression that Daniel Kinzie had moved to Indiana before I bought the horse and wagon, for I remember well that he went to the depot in Mr. Kinzie's wagon when he moved, and I went with him in the same wagon.

Had you not bought your horse and wagon before you had agreed and made your purchase of Daniel Kinzie's property?

I did not make any permanent agreement to buy Daniel Kinzie's property. James Kinzie made out a deed for Daniel Kinzie's property, and had it in his possession, and he wished to put my name in it as making the deed to me; I told him I wished to see my brother before I bought any more land; he said Daniel Kinzie was subject to fits, which I know to be the fact, for he had one, one day, and I was sitting talking to him in Mr. James Kinzie's, and for that reason he, James Kinzie, thought it was best for Daniel Kinzie to move back to Indiana amongst his own relations. James Kinzie had this deed, or he told me he had it, in his pocket, when Daniel Kinzie left Wisconsin for Indiana; and when James Kinzie and myself were on our way to Racine, he said, he took the deed with him to show my brother if we should meet him in Wisconsin, on our return from Racine, as I had told him I thought probably he would be there about that time. And I think that is the trip when I bought the horse.

How many trips did you make to Racine with Mr. Kinzie?
Two, I think.

Did you buy your horse and buggy in Racine?

I did; or Mr. Millett bought the buggy for me.

Was that upon the occasion of your first visit to Racine?

It was on the occasion of the first visit.

Upon the occasion of your second visit to Racine with Mr. Kinzie, who started from the town of Clyde with you?

Mr. Kinzie and his son Robert.

Did Daniel Kinzie and his family start with you?

They did not, for I went over with my own horse and buggy.

Did Daniel Kinzie and family start that day for Indiana?

They did not.

Had they before then gone to Indiana.

They had.

How long before?

Sometime before; I don't recollect as to the time.

Will you refresh your recollection, and state about how long before?

I can tell the exact time by referring to my report.

Can you not state near about the time, without such reference?

I cannot.

Will you refer to your memorandum, and state when Daniel Kinzie left Clyde for Indiana?

I will look in my memorandum and see if it is in that part which I have with me. (Witness examines his book, and says :) Monday morning, at 3.30, or about that time, the fourth of May, Daniel Kinzie left with his family for Indiana.

When did you leave on the second expedition to Racine with James Kinzie?

On Thursday, the fourth of June, I left Clyde.

Will you refer to your memorandum, and state what was the date of your leaving Racine for Clyde on your former visit?

On the eighth of May.

After you had been to Mr. Kinzie's house a few days, did you go to Mineral Point?

I think I went on my first trip to Mineral Point with Mr. Kinzie the day after election, the eighth of April.

Had you not been to Mineral Point before that alone; and had not Mr. Kinzie declined your invitation to go with you; and did you not complain to his son, Robert, saying, substantially, that as you were going to buy his land, you thought his father ought to have gone with you?

I don't remember of ever going to Mineral Point alone. Robert Kinzie went with me on one occasion to Mineral Point, but I am under the impression the first time I ever went to Mineral Point, was on the eighth of April, and that was on the occasion of James Kinzie's invitation, as he had to take the election returns to Mineral Point on that day. I can tell by referring to my report, whether that was my first trip to Mineral Point, or not, positive.

Did you ever have such conversation with Robert Kinzie ?

I might have done, for I have talked to Robert Kinzie in different ways on different subjects, knowing he told his father all I said to him.

Do you remember to have told James Kinzie, on the journey to Mineral Point, the day after the election, substantially, that you felt hard a few days before because he did not go to Mineral Point with you, but that you did not know as you ought to have felt so, and that the reason why you desired him to go with you was, that the people supposed you had a good deal of money with you, and that you were a little fearful to go alone ?

I did not tell him so.

Did you say anything to him to that effect?

I did not.

Did you propose to James Kinzie to go with him, on that occasion, to Mineral Point; and did you give, as a reason for wishing to go, in the presence of Robert Kinzie and Mrs. Kinzie, that you wished to buy a fine horse and buggy; that you could not find one that suited you ; that you had a fine horse in New York; that you did not know but that you would have to send after your own horse to New York; and did you pay any, and what share, of the expenses of that trip ?

I went on that occasion solely on Mr. Kinzie's invitation ; he gave me the invitation on election day, at the school-house, which the election was held in.    I might have spoken of a horse and wagon at Mr. Kinzie's house, but I am sure not on that occasion, for I pretended to Mr. Kinzie that I did not wish to go, on the account of the roads being so bad, caused by heavy snow falling on election day.    I paid my own bill, and Mr. Kinzie paid his, and made the remark at the time that it came out of the county.    I have never told them that I then owned a horse in New York, but I have frequently spoken, when horses have been in conversation, of my father having a very fine horse, and I thought I could get him out of the old man, by sending for him, and writing a nice letter to my brother, William.

What team did you have on that trip to Mineral Point?

Kinzie had his own team.

Did you not pay half the expenses of that team ?

I think I paid for our dinners at Dodgeville, because Kinzie had no small change ; and he paid for dinner at Dodgeville on our return ; I did not pay half the expenses of the team.

In answer to your statement, that you wished to buy a fine horse, did Kinzie say to you, that he thought you could buy a fine horse, or suit yourself, in Racine or Chicago, as there were good horses there ; but if you got a fine horse in either

of those places, you would have to pay for it; and did you answer, you did not mind the price, that you would rather give four or five hundred dollars for a good horse, than any price for a poor one ; did Kinzie say that when he was in Racine last, a friend of his, by the name of Millett, had a good horse; that he had heard Mr. Millett say that he had a great notion to buy a French horse of Mr. Walker, at Ottawa, Illinois; and that he did not know that Millett had bought this horse of Walker, but that if he purchased it, he thought you could get one of the horses of Millett; but that if you did purchase either one, you would have to pay a high price for it ; and did you not thereupon urge Mr. Kinzie to go to Racine with you, for the purpose of buying one of those horses, urging that you thought you could get the horse cheaper of Millett, if he would go along with you, as he was acquainted with Millett, and you was a perfect stranger ; and did you not offer to pay the expenses of the trip, if he would go along with you ; and did not Mr. Kinzie tell you that he could not go along at that time ?

There was no such conversation took place at that time ; there was a conversation about Millett's horses, a few days previous to our leaving on our first trip to Racine ; I went solely on Mr. Kinzie's invitation, and he spoke of this horse in the way of inducing me to go to Racine with him ; I did not offer to pay any of his expenses ; nor did I pay his expenses on that occasion ; nor did I know that Daniel Kinzie and family were going to move to Indiana on that morning, until we had arrived at Daniel Kinzie's house ; and when he spoke of Walker's horse, he said he had told Millett to buy him, and that he was going to give a big price for him ; but he thought that if I would go with him that I could get him about right, for he had bought horses of Millett before, and he did not think Millett wanted to keep this horse spoken of, on hand, for he had good horses without it.

Do you remember, that a short time afterwards Kinzie received from Millett a letter, which you have before referred to, and did you read that letter, or hear it read ?

I remember of his receiving the letter, and he, James Kinzie, read part of it to me, and said he would like to have me go with him when he went to Racine.

Did you not read, or hear read, the whole of that letter ? I did not.

Did that letter give a reason why, or state the business upon which Mr. Millett desired Mr. Kinzie to go to Racine ?

I remember it requested him to come on the first of the week ; and I either heard it read, or James Kinzie told me afterwards, that Mr. Walker, from Ottawa, was to be there, and he, Mr.

Millett, wished to see them both there together ; and that was one reason why Mr. Kinzie wished me to go with him ; he said Mr. Walker was an old friend of his, and a good fellow, and he wished to make me acquainted with him.

Did not Mr. Millett state in that letter to Mr. Kinzie substantially as follows : " That he had an opportunity to sell his, Kinzie's, place or property in Racine ; that he wished him to come there for that purpose ; that if he could be there at the times therein stated, he thought he would meet an old acquaintance there in the person of George E. Walker, whom he understood was expected there " ?

Not to my knowledge ; Mr. Kinzie told me that there was some person in Racine who had been speaking for sometime of buying some of his property at Racine, and he thought he could sell it to them while on that visit ; he has read parts of several letters to me at different times from different persons, and in other instances he has given me the letter to read myself, but in this case he did not.

Did Kinzie write a reply to that letter, seal it, and deliver it to you to be put in the postoffice at Franklin, Mineral Point, or elsewhere ? and if so, what did you do with that letter ?

He did, and I mailed it at Mineral Point, and was in Racine when Mr. Millett received it.

Was Kinzie with you at Racine when he received it ?

He was.

Have you ever had possession of that letter since ?

I have not ; I saw Mr. Millett have it in his hands and make the remark to Mr. Kinzie, " Jim, I've just received that letter you sent me, that you said Roe mailed at Mineral Point for me." Kinzie said, " that you couldn't depend on the mail."

Can you by reference to your memorandum book give the date or near about the date of that letter ?

I think I can.

Give us the date.

If he dated it right, he wrote it on Sunday the 31st of May.

How soon was that written after the receipt of the letter from Millett ?

He received the letter from Millett on Saturday, and wrote this letter the next day.

Will you state again the date of your first visit to Racine with Kinzie ?

Monday, May the 4th.

Was it not before your first visit to Racine that Kinzie received the letter from Millett before referred to, the answer to which, you state you received and mailed at Mineral Point ?

It was not.

Had Kinzie, to your knowledge, before that, received a similar letter from Millett, requesting him to come to Racine ?

Not to my knowledge.

After the letter was received, the answer to which you say you mailed, did you not request Kinzie to wait and not to go for a few days, as you wanted to go to Franklin or Mineral Point ; and that when you returned you would go with him, as you wished to go there to see if you could purchase Millett's horse ; and did you not go to Franklin or Mineral Point, and take the letter from Kinzie to Millett ?

I told him something of that kind, when he was urging me to go with him on Monday or Tuesday, and told him that if he would wait until the last part of the week, that I would go with him. He said he would wait for me until Friday ; then, if I was not back, he would have to go without me. I told him I would be back by Wednesday or Thursday, sure. He then sat down and wrote the letter to Millett, stating he would be there the last of the week. This was on Sunday, and I left on Monday.

Do you mean to say, in substance, that you gave, as a reason or excuse, to him, that you wanted to go and buy this horse ?

I did ; but I did not use the word " wanted." I told him if I did go, that I would buy Millett's horse, if he would sell him for what I considered right. He, Kinzie, said that he would make Millett take $100 less than he had been asking for him.

Before leaving, with Mr. Kinzie, for Racine, on that occasion, did he accompany you to Prairie du Chien ?

He did.

Did you invite him to go with you to Prairie Du Chien, representing to him that your brother desired a place to locate in the mercantile business ; that you wanted to look at that section of the country, to see if it would suit him ; that, as Kinzie was acquainted with the country, you wished him to go with you, and that you would pay the expenses ; and did you add, that as you had a good deal of money with you, you did not like to go alone ; and did he consent to go with you, and did you pay the expenses ?

I told him all that, or something to that amount, with the exception of, that I had a good deal of money, and did not like to travel alone. I paid the expenses, or nearly all of them.

Did you, on that day, after your arrival at Prairie du Chien, tell Mr. Kinzie that that country would suit your brother, and that you had come to the conclusion that you would take his land, and pay him his price for it ; that you would pay him a part of the money down ; that you expected your money along every day, and that, when it arrived, you would pay the bal-

ance; and did you then propose to him to go to your room at the hotel, and have the agreement made out for the sale of the land; and in the room, did you take out your money, $500, in gold, or thereabouts, and lay it upon the table?

I told Mr. Kinzie that I liked the country, and thought my brother would. I told him, after the conversation which we had had, to name his price for his farm, and I would tell him whether I would give it, or not. He told me he would take five thousand dollars. I told him I would give him four thousand five hundred. In a short time after, he told me he would take it. I told him I expected my certificates of deposit in a few days. I asked him to go to a lawyer's office, to have the papers made out, and we got into a conversation about bargaining for an interest in his interest; and while talking about it, he said we had better go to the room—meaning our room, I suppose. I did not exhibit any money while there. I took the vest off, which contained the money, in Mr. Blair's office, and Kinzie untied it himself.

Did you not expose your money upon the table, in the room, at the hotel, where the bond for the sale of the land, and the agreement for the sale of the pretended interest in the property in Chicago, were made out; and at the time, did you not say to Kinzie that you were paying him a large price for his land; that his nephew, Daniel Kinzie, and others, had informed you that he had some interest in Chicago matters; that at some time a deed had been made to him, Kinzie, and lost; that the deed might be found yet, and that you wanted he should interest you in some of his claims? Did not Kinzie reply to you, substantially, that he had no interest of any account in Chicago; that Major Kingsbury had promised to give him a lot there, but that the Major was now dead? To which did you not reply, that you would run the risk of that; that you liked to buy interests in claims; and did you not then refer to the eighty acres of land in controversy here, naming the parties as well as you affected to be able to recall them, saying: We don't know what may turn up; that the deed might be found, and we might make something out of it yet? And did not Kinzie distinctly assert and explain to you that he had no interest whatever in the matter; that whichever side succeeded in the controversy, he, at least, had no interest? Did you not say, in reply to his remark, that if he sold you any interest in his old Chicago matters, you would never see your money back; that you would run the risk of it; if you did not get anything it would make no difference; that you regarded the matter as a lottery; that you did not care for $500, and would not care a damn if you lost it? And did you not assume and affect to be unwilling to

close the contract for the purchase of the land, and pay the money, until Kinzie would consent to give you a writing, purporting to convey to you an interest in the property here in controversy? Did you not tell him that you had learned from Daniel Kinzie and others, as aforesaid, that he and Millett were to have one-half of the property, if Bennett succeeded in the suit; that you had heard that the property was worth several hundred thousand dollars; that you would give him $500 for a tenth interest, at any rate, and take your chances? And did not Kinzie, having repeatedly re-asserted that he had in fact no interest there, finally tell you, that if you insisted upon buying and paying your money for such a claim, in which there was no value, and with your eyes open, that you must never come back on him for the re-payment of the $500, when you would eventually find that you could get nothing?

I did not expose my money, nor was there any such conversation took place between James Kinzie and myself.

Did you not know, at that time, that James Kinzie owed a mortgage for a considerable amount to his nephew, James Kinzie, in Indiana, which he was anxious to pay?

James Kinzie himself, the old gentleman, had told me previous to that time, that he owed James Kinzie, of Indiana, $300, but said it made no difference when he paid him, as long as he paid him before I paid him the balance on the farm.

Were not both agreements, the one for the sale of the farm, and the other for the interest in the property here in controversy, made out the same day at Prairie du Chien?

They were.

How much did you pay in all to James Kinzie, and when and how were the payments made?

Eleven hundred dollars. I paid him $300 on the farm at Prairie du Chien, and $200 on the agreement at the same place; I paid him $600 in certificates of deposit at Mineral Point, $300 on the farm, and $300 on the agreement of the Chicago eighty acres of land.

Did you pay him two certificates of deposit, of $300 each?

I gave him three certificates; one $100, one $200, and one $300.

Did you pay him a certificate of deposit, of $100?

I did.

Can you state by what bank, and to whose order, or otherwise describe or identify that certificate of deposit for $100.

I cannot describe the bank, for the certificates that I had were on two different banks; one, I think, the Union Bank; the other, I also think, was the Bank of America. I took no minute of

11

the banks ; they were New York city banks, but I could identify the certificates if I ever saw them again.

Upon what bank was the $300 certificate ?

I cannot remember the denomination, nor neither the particular banks.

Were the certificates issued by more than two banks ?

They were not.

Were two of them issued by one bank ?

I think they were.

Was the $100 certificate one of those two issued by the same bank ?

I am under the impression that the $100 and $200 certificates were issued by one bank, but I am not certain.

From whom did you receive those certificates ?

They were sent to me by Mr. Pinkerton, or some of his clerks.

Did you take no memorandum or description of those certificates ?

I did not.

Have you seen any since ?

I have not.

Did you not pay to James Kinzie a certificate of $300, which was applied upon the agreement, and a certificate of $200, and a gold watch, apprized at $100, making other $300 to apply on the bond for the land ; and did you not yourself keep and misapply to your own uses the certificate for $100, falsely representing to your employers that you had paid that to James Kinzie ?

I did not. I paid him $300 on the bond of the farm, and $300 on the agreement for the interest in the Chicago eighty acres of land, in certificates of deposit.

Did you not deliver to Kinzie a gold watch, apprized at $100, which was a portion of the credit indorsed upon one or the other of those agreements ; and did you not subsequently borrow from Kinzie that watch to carry, telling him that you were expecting a new watch on from New York in a few days, and that you wished him to loan you that watch until yours arrived ; and did you not bring that watch away with you when you left that country ; and do you not wear it upon your person now ?

I never agreed to give James Kinzie any watch, nor did I ever deliver one to him, nor do I believe that he ever had any watch in his hands ; and furthermore, I am certain that he cannot tell what kind of a watch I then carried, only that it was a gold one. I have the same watch with me now that I then carried ; nor did I ever agree to pay him anything but money or certificates of deposit on either of the agreements ; nor did I ever give him anything but money and certificates of deposit.

In the purchase of Kinzie's farm, did you agree to take from him a span of horses and harness and a double wagon, for $325?

I did not; he told me to say to James Anderson and others, James Anderson, a brother-in-law of Daniel Kinzie, that I had bought them, so that he would not be bothered with them a-coming to borrow them, as James Anderson, in particular, abused them when he was using them; and I told them what he wished me to.

Did you not tell him that you were expecting your money in a few days, and that when it came, you would pay him for the horses, harness and wagon? After waiting some time, and the money not coming, did you not pretend to have received a letter stating that your brother had arrived from Kansas at New York, and had got married on his arrival; and that, riding out with his wife one day, the horses had run away, and injured your brother, so that he could not come, and that perhaps they would wait now until he got well, and then he would come out and bring the money with him?

I might have told him that I would pay him for the horses, at the time when some one has been asking him for the use of the horses, for I have talked in different ways, when persons have applied to him for the horses, for the purpose of carrying out his wishes; but the story about my brother, I told him on my return from one of my trips at Mineral Point, when he asked me if I had received a letter from home, and as he had said before my going to Mineral Point, that it was strange my brother did not come.

When you proposed to change the bond, having it run to Richard Lawrence, instead of Peter G. Roe, did you not tell him that Lawrence was your brother-in-law?

I told him I thought he would be, as he was a young man paying attention to my sister.

Was that true?

It was not, to my knowledge.

You went to Mineral Point at that time, when the certificates of deposit were paid, for the purpose of correcting the bond from Peter G. Roe to Lawrence; had you, or did you represent that you had, a short time before that, received through the postoffice at Highland, $1,500 in certificates of deposit, and did you exhibit them to Mr. Kinzie?

I exhibited them to Mr. Kinzie on my return from Highland, and told him I had received them from New York, but the time that I paid them to him at Mineral Point, I did not go for the purpose, nor I did not tell him I was going for the purpose of correcting the bond. I am under the impression that I went with him that time, as he had to attend the county board of

supervisors, and I did not say anything to him about the bond until after our arrival at Mineral Point. I remember this well, because he said that I ought to have told him before he left home, so that he could have taken a description of the land, and that was the cause of the third bond being made out, through his mistake describing the land.

Did you not have with you, at Mineral Point, the first bond, when the second was executed?

I had.

After your return from Mineral Point, on the occasion of the correction in the bond, after the third bond was given, did you not go to Racine with Mr. Kinzie, and was not that the occasion when you purchased your horse and wagon?

I am under the impression that the third bond was made out sometime after I bought the horse and wagon.

Can you give the date when the third bond was executed, by reference to your memoranda, or otherwise?

I think I can.

Give it.

It was on Tuesday, May the 19th.

On the occasion of your second visit to Racine with Mr. Kinzie, did you ask Mr. Kinzie to go with you, under the pretense that you wanted to buy another horse, saying that you were determined to get Millett's horse, and that you could buy him one hundred dollars cheaper if Kinzie would go along with you and help you buy him?

I went solely on Mr. Kinzie's invitation. I promised him I would go before the horse was spoken of at all.

Did you pay the expenses of that trip, or any, and what portion of them?

I paid the hotel bill at the Baker house in Racine, by Mr. Kinzie's request, saying, if he paid his hotel bill he would not have money enough to pay his way home. I paid his bill and my own, which I think amounted to $18; he gave me the $9 back in a few days after he returned home. That was all the expense which I paid for him, with the exception I might have asked him to go and take dinner with me, or supper, or breakfast, as the case might have been, as he has done the same to me when we have been riding through the country.

Had not Daniel Kinzie at that time sold out his place to you, or had you not made a contract with him for the purchase of his place; and did you not say that you had made arrangements to have your father or brother send you money to Madison, Wisconsin, and that you would have to go to Madison, anyhow, for your money, and that if Kinzie would go along to Racine with you, you would pay to him the money for Daniel Kinzie's

land, and if you were not disappointed, you would pay him, James Kinzie, all the balance of the money due on his land when you got to Madison; that if Daniel Kinzie would make out a deed and leave it with James Kinzie, you would pay him the money when you arrived in Madison, and that he, James, could hand the deed to you; in pursuance of which suggestion and expectation, did not Daniel Kinzie execute and leave in James Kinzie's hands for you, a deed of his property; and did not James Kinzie, on the strength of your professed expectation and promise of receiving the money at Madison, advance to Daniel Kinzie, one hundred dollars of the amount; and further relying on your promise, did not James Kinzie tell you that if you received your money at Madison, he wanted and intended to go to Elkhart in Indiana, and pay his nephew, James, the mortgage on his farm; and that he intended on his return, or on his way through Chicago, to stop a couple of days to have his deposition taken in a case there in court, by Mr. Waller, if he wished to take it; and did you not disappoint him when you reached Madison, and tell him that your money was not received; and therefore, did he not abandon his intended visit to Elkhart; and did he not mention these circumstances to Millett, at Racine in your presence; and did he not state to Millett that he had wanted to stop a day or two in Chicago, to let Mr. Waller take his cross-examination, if he wished it; and did not Millett reply, he did not think he need put himself to any trouble about that, for if Mr. Waller wanted to take his cross-examination, he could send up where he lived and take it?

I had made no contract with Daniel Kinzie for the purchase of his place; but Daniel Kinzie and myself, and James Kinzie, had been talking about the matter, and a few evenings before Daniel Kinzie left the State of Wisconsin, he and his wife were at James Kinzie's and signed a blank deed, and after they had gone, James Kinzie wanted to fill the deed up to me; I told him, no; that I would not buy it until I had seen my brother. I did not say that I had made arrangements with my father or brother to send me money to Madison, Wisconsin, but on previous occasions I have said that if my brother met me at Madison, that he would bring both his and my money out with him. I did not say that I would have to go to Madison anyhow for my money. I did not tell Kinzie that if he would go with me to Racine, I would pay him Daniel Kinzie's money. I went solely on James Kinzie's invitation. I did not say that if I was not disappointed I would pay him the balance due on his land when I got to Madison. I did not tell him that if Daniel Kinzie would make out a deed and leave it with him, that I would pay him the money when I arrived at Madison; nor that he,

James, could hand the deed to me. Daniel Kinzie did not execute and leave a deed in James Kinzie's hands for me, of his property, without he done it on his own responsibility. I do not know whether James Kinzie did or did not advance money to Daniel Kinzie on any expectation that I was going to take Daniel Kinzie's land, nor did I know that Daniel Kinzie was going to leave Wisconsin at the time he did leave; nor did any one in the neighborhood know, excepting his own relations, for when Kinzie and myself returned from Racine, the whole neighborhood accused me and James Kinzie of assisting Daniel Kinzie to run away, and a short time afterwards I heard a store-keeper in Jonesdale, asking James Kinzie how it was that Daniel Kinzie came to run away and not pay him after he had been so kind to him in trusting him for goods out of his store; and there was a gentleman immediately in the neighborhood, Cameron, I think his name is, got wind of Daniel Kinzie being about to run away, and went out on the road leading to Avoca, and remained there sometime to catch him, as he passed; but Daniel Kinzie had passed there before this person arrived at the place; as Daniel Kinzie left the town of Clyde, about 3.30 A. M. James Kinzie did not tell me that if I received my money at Madison, he wanted and intended to go to Elkhart in Indiana, and pay his nephew, James Kinzie, the mortgage on his, old man Kinzie's, farm; he did not tell me that he intended on his return, or on his way through Chicago, to stop a couple of days to have his deposition taken in a case there in court, by Mr. Waller, if he wished to take it; and I did not disappoint him when we reached Madison, and did not tell him that my money was not received. He did not abandon his intended visit to Elkhart, and he did not mention anything of the kind to Mr. Millett at Racine, in my presence; nor did he tell Mr. Millett that he wanted to stay in Chicago two or three days, to let Mr. Waller take his cross-examination; nor did Millett reply he did not think he need put himself to any trouble about that, nor say that if Mr. Waller wanted to take his cross-examination, he could send up where he, Kinzie, lived, and take it in my presence. But Mr. Millett did say in my presence, to Mr. Kinzie, that he must not go near Chicago. When James Kinzie told him, Mr. Millett, that he, Kinzie, was on his way to Elkhart, he, Kinzie, told Millett that if he said that he must not go to Chicago, he would not go, and that is the reason that James Kinzie did not go to Indiana on that occasion.

Did Daniel Kinzie run away from Clyde?

He did.

Did he leave for any other offense than that of being in debt?

Not to my knowledge; I heard some inquiry made by per-

sons in that neighborhood, if Daniel Kinzie had paid over what monies he had collected for a singing school teacher. I know from my own knowledge that he was on the committee for collecting such money, for I gave him a dollar myself, but do not know whether he paid over what money he collected, to the proper person.

Had you any other motive than to prejudice the case now here being defended on the part of Bennett, by introducing, as you did in your answer to the 439th interrogatory, the statement respecting Daniel Kinzie's absconding from Clyde, fancying, remotely, at least, it might seem to reflect upon James Kinzie, and thus injure the cause of the defendant, Bennett?

I have stated nothing but plain facts, as they occurred, and would not have stated them if it had not been to show that I had nothing to do with Daniel Kinzie's leaving Wisconsin, and the answer was drawn from me by the question.

Do you remember any occasion, when you were at Madison, or Stoughton, that there was lecturing there upon abolitionism, or some other subject, a person by the name of Anderson, represented to be a free negro, and while there delivering his lecture, did you not take his cane and carry it away with you to Clyde and exhibit it, stating, in the presence of several persons, that while a negro was lecturing you stole his cane; that you thought it worth about $5; or did you do, or say anything, and what, to the above effect?

During one of my visits to Madison, there was a negro, by the name of Anderson, who attempted to lecture on abolitionism, or so I was told; I was not in the hall where they said he attempted to deliver his lecture; I was also told by the landlord, or the person which I have always taken for the landlord of the City Hotel at Madison, that this negro, during the time of his lecture in the hall, used language before ladies of a most degrading character, and for which, and for being drunk, the negro was locked up. The day the landlord told this, was the day after the night of the lecture; during the day, this negro, Anderson, came into the saloon of the City Hotel, and some one standing there, or sitting, asked Anderson if he was going to lecture that evening; he was intoxicated at the time; he said he was if he had to use this, at the same time pulling a sword out of the cane. I took the cane, as he stood it by the counter while he was drinking, and handed it to the bar-tender; the negro looked round for his cane for a short time and pulled out a pistol, and said, that if he had not his cane, he had that to use; then some one stepped up to him, and told him that if he did not leave the saloon they would take that away from him, meaning his pistol. Professor Anderson, as he called himself,

then left the saloon, and when I left for Clyde, or about the time I was leaving, the bar-tender and others said to me, Professor Anderson, do n't go away until you get your cane, at the same time the bar-tender handed me the cane, and I took it to Clyde with me; but never told Kinzie, or any one else to my knowledge, that the cane was worth five dollars, although I might have done so, for I remember telling Kinzie a long statement about the cane, which he enjoyed, and rehearsed it to several of his democratic friends. I have been to Madison two or three times since that occurrence, and have met some of those gentlemen, which were in the saloon at the time of the occurrence, and they have stopped me in the street, calling me Professor Anderson, and said they knew me by the cane, which I had then; I have taken the same cane with me two or three times to Madison.

Did you give the same history of the manner in which you possessed yourself of the cane, to Kinzie and others at Clyde; and was that the history you say Kinzie so frequently rehearsed with so much satisfaction to his democratic friends at Clyde in your presence?

I told Kinzie what had been done to the negro at Stoughton and Milwaukee and Madison, what the landlord had told me; I told it in such a way that he would suppose that I was in the hall at Madison, at the lecture, and was one of those who threw rotten eggs at Anderson, and assisted in getting him to jail, and took his cane away from him at that time; he used to rehearse something similar to this.

Did not a statement shortly after appear in the Wisconsin Republican, or other newspaper, to the effect that while this negro preacher, or lecturer, was delivering his lecture, or at some other time, while he was at Madison, same rascal stole his cane; and did not Kinzie read this statement in your presence, and that of others, and remark, "why, Roe, you did really steal the nigger's cane, for here is a notice in the newspaper about it," or language to that effect?

I remember reading a piece myself in a democratic paper, commenting on Professor Anderson's course of lectures, setting forth how he had conducted himself at different places at which he had attempted to lecture, and how he had been dealt with by the authorities, and others while lecturing, and after his lectures; it also spoke of the cane; I showed this to Kinzie myself, and I have heard him read it to different democrats in town, and at the same time using the words, "the damn nigger ought to have been thrown into the lake at Madison." Kinzie has told the story about the cane when I have been with him at Franklin, Dodgeville and Mineral Point, when he has been

introducing me as a true democrat to his democratic friends and men that hold the highest office in that county by the gift of the people.

Did you never reject this test of your democracy, or decline the distinction of being so introduced by Mr. Kinzie as one who had accomplished such a worthy exploit as to steal a negro lecturer's cane, wherewith he intended to protect his rights and liberty of free speech?

I always corroborated Mr. Kinzie's statement about the cane, and have drank on the story several different times, and at different places at the time he was telling the story, or right after; and Mr. Kinzie has said that that was a test of my democracy, and he was glad that he was going to leave such a good democrat in his place on Otter Creek, to take care of the democratic party there. This, I think, he told to Judge Cochrane.

Did the statement which you say was published in a democratic newspaper, respecting the loss of the cane, conform to the narrative of the circumstances which you had given of it to Kinzie and others, at Clyde?

I think not. I do n't remember exactly how the publication read, but I do know it was intended for a burlesque on Professor Anderson's course of lectures, to show the downfall of the republicans, at different places where he attempted to lecture, and it was read as such by Kinzie to his democratic friends.

Was the discrepancy between your history, and the newspaper account of it, noticed or commented upon by Kinzie or others?

It was, by Kinzie; and I told him that it was after dark when it occurred, and the reporter did not see all that occurred. Kinzie told me that they had enough in to show what damned blackguards the republicans and abolitionists were, in having a nigger to run round lecturing for them. Kinzie has been to Madison with me, when I carried the cane spoken of, since his reading the article in the paper.

Now, Sir, did that article state any thing or circumstance respecting the loss of the cane, beyond the mere fact that somebody had stolen it?

I do n't remember—it might and it might not.

Were you at Mineral Point with Kinzie, on the occasion when his cross-examination was taken by Mr. Waller?

Part of the time.

Did you, at any time while there, on that occasion, endeavor to get Kinzie, or propose or suggest to him to swear, on his cross-examination, that he had never sold or conveyed any interest, or pretended interest, in the property in controversy in this suit?

I asked him if he had not denied everything as far as he had went. This was at the time that he asked me for the agreement. He said he had, but Mr. Waller had only just touched on that subject. As to the agreement, I asked him if he could not face on that too. He said he could, but he wished that he had the agreement in his pocket; and said : but damn it, I will go up stairs and face on it, or deny it. He then went to the bar, and we took a drink together; after which, he went up stairs. That was all that was said between James Kinzie and myself, while at Mineral Point, on that subject of swearing false, or denying anything, excepting the night before, he told me positive that he would stick as close to his old deposition as he could, and deny everything.

How long had the examination been proceeding when you left ?

If I remember right, it commenced on Friday afternoon, and I left on Saturday morning after breakfast.

About what time on Saturday forenoon did you leave ?

I do n't know the time, but it was soon after breakfast. I did not look at any time piece when I left.

Was it before or after the commencement of the examination on Saturday morning?

After.

Did not Kinzie come out of the room, during the progress of that examination that morning, and meet you in the room below, and there say to you, in substance, that Mr. Waller might examine him or ask him questions respecting his having sold or made conveyance of any interest in this property, and that if he did, he wished to be able to answer intelligently and correctly ; that he did not know what was contained in the writing he had given you; and did he not ask you to let him see it, assuring you that he would immediately return it to you ? Did you not reply to him, in substance, that there was no danger of Waller's asking him any questions on that subject, as he could know nothing about it ? Did not Kinzie reply, in substance, that he might, however, and that if he did, he wished to be prepared to answer him, and he was afraid he might not state it just as it was, unless he could see the writing again; and did you not tell him, in substance, that he need not say anything about it; just to consider that sale and writing as done away with; to consider the money as all paid on the land; and that you would consider the agreement about the claim as all null and void, and as if it had never been made; and just to swear that he had never made sale or agreed to sell any interest in the property? Did not Kinzie reply to that, in substance, that will not do? I cannot swear to that, since I have made a writing about

it, and I want you to let me see the paper only for one minute, and I will give it back to you. You do n't think, do you, that I want to keep it from you. Did you not reply, Oh! certainly, you can see it; and did you not go and get your carpet bag or portmanteau, open it, and affecting surprise at not being able to find it, did you not say, soliloquizing, substantially, why, what have I done with that paper; could I have sent that with my other papers to my father, to put in the bank, and pausing, as if reflecting, add, that was damn careless, or foolish; I must have done so; but no matter, just go up and swear that you never made any such agreement; you have nothing to fear, God damn it; I tell you, Waller can never know or find out anything about it?

Kinzie did come to me in the room down stairs, on the first floor of the hotel, and told me he had come out of the room where they were taking his deposition; but there was no such conversation, or to the effect, took place between Kinzie and me. When Kinzie asked me for the agreement, he said he wanted to keep it in his pocket until after they had got through taking his deposition; then he would give it back to me. I did get my carpet bag under the pretense of looking for it, and when I opened it and searched for it, I told him I remembered that I had put it in an envelope and sealed it up, and put it in a letter a few days before that, and sent it to my father.

Did you not immediately after this conversation with Kinzie leave in your buggy, which was then ready waiting for you?

In a short time after, that I paid my bill, and went to the stable and helped the hostler to hitch my horse to the buggy.

Was not your horse already harnessed, hitched, and in readiness for your departure?

He was not, for I helped to hitch him to the wagon myself. He might have been harnessed, but I was there when he was brought out of the stable to be hitched to the wagon.

Did you ever take from any postoffice a letter or communication addressed to James Kinzie, which you unsealed or opened, and never delivered to him?

I did not.

On the occasion of either of your trips to Chicago, while you were engaged in this enterprise, did you procure or receive from any person, and take back with you to Clyde [and before the time that you made the purchase of Kinzie's farm] any blank form or forms of bonds, or instrument of agreement, to be employed, or to serve as a form and guide in the drafting of an agreement or the purchase of land, and from whom did you receive such forms?

I did not take any such forms or guides with me, but I did receive a form from Mr. Pinkerton, or from his office, but I did not use it, for I have long known the form of drawing an agreement, on a purchase, made between men.

When at Racine, did you form the acquaintance of a man by the name of Troop, and when you were there, and on the occasion of your being there the last time, with Kinzie, on the 6th of June, between Racine and Utley's, did you say to Troop, in substance, that you were after an important matter; that you had been, for a long time, sleeping with James Kinzie, and that, if you succeeded in what you were after, you would make your fortune?

I was introduced to Mr. Troop by either James Kinzie or Mr. Millett; and there never was any such conversation took place between Mr. Troop and me, or any one else. I rode with Mr. Troop out to Utley's race course. Mr. Kinzie and Mr. Millett went, in another buggy, to the same place. I went on Millett's invitation to the race course, to see his horse go, that he was then keeping at Mr. Utley's. On our return I rode with Mr. Millett, in his buggy, and Kinzie rode with Troop, back to the Baker House, in Racine. Mr. Troop was a perfect stranger to me. I had never seen him before I was introduced to him by Mr. Millett or Kinzie, I do not remember which.

Do you know Isaac N. Parker, of Racine?

I may know him, but do n't remember the name, for Kinzie and Millett, both of them, introduced me to a great many men there.

On the 8th of June last, in front of or near by Deersly and Barker's saloon, in the city of Racine, did you tell Isaac N. Parker that you had been employed by a Mr. Waller, of Kentucky, to come to Wisconsin to help him, Waller, to perfect a title to a piece of land in Chicago, of very great value; that it was in litigation; that Mr. Waller was one of the parties in interest; that you had been sleeping with Kinzie for three months past, for that purpose; that if Mr. Waller succeeded in the suit, that you would make your pile out of it, or words to that effect?

I do n't know any man by that name, to the best of my recollection, but I may know the person, if I should see him, as Kinzie has introduced me to so many different persons in Racine, but I am quite positive that no such conversation ever took place between me and any person.

Do you not know, and can you not answer with certainty, whether any conversation, in substance such as is involved in the last interrogatory, did or did not take place with Isaac N. Parker, or with any other person, at or near the point indicated?

I know positive that there was no such conversation, or any-

thing to that effect, ever took place between me and any other person.

Are you as certain of that as you are of any of the statements which you have made here, respecting your interviews, talks and transactions with James Kinzie ?

I am as certain of that as I am of any other answer I have given—positive.

Did you hold the same or similar language, and make like statements to one Hiram George, on or near the corner of Main and Fourth streets, west of the postoffice, in Racine, and on or about the day last above indicated ?

I do n't know that I do know a man by that name, as I kept no minute of the names of different persons that Kinzie introduced me to, excepting persons whom Kinzie told me knew about the Chicago suit, but I do know certain that I never had any such like conversation with any persons.

Did you form the acquaintance, and have any conversation with any person or persons in Racine, to whom you were not introduced by either Mr. Kinzie or Mr. Millett ?

Yes, with the proprietor, or the person I took to be the proprietor, of the Baker House, and his bar-tender, in the saloon, and I might have done so with two or three other gentlemen.

Were there not more than two or three ?

There might have been.

What object had you in your answers relating to your acquaintance with these respective persons named in my former interrogatories, to so repeatedly relate that Kinzie and Millett introduced you, and was it with the purpose of implying by your testimony that your only acquaintance there was with those who were known to you to be Kinzie's or Millett's personal friends, and they were, in fact, your only mediums of acquaintance with such persons as you came to know there ?

I had no object ; and I am not acquainted with any one in Racine which I conversed with, as an acquaintance, on any subject, but those which either Millett or Kinzie introduced me to, except the proprietor of the Baker House, and his saloon keeper. There are several gentlemen there that I have spoken to when passing them in the street, or meeting them at saloons, but I have no acquaintance with them.

Did you at any time while at Racine, make efforts or inquiries having in view the impeachment of James Kinzie, and to this end did you not ask Parker and Hiram George both, if they could not help you to get witnesses to swear that Kinzie had made statements in reference to the title to land in controversy, where Waller was one of the parties, and which was claimed by a minor ; and did you not tell them on the occasion, and at the

place indicated, or did you not intimate to them, that if they, or either of them, would give evidence to impeach the testimony of Kinzie, that you would pay them devilish well for it?

I did, while at Racine, make efforts in the way of listening to all that Kinzie and Millett had to say to one another upon the Chicago suit, between Bennett, Waller and others; but I made no efforts or inquiry in any other way, nor was there ever any such conversation, or anything to that effect, as is set forth in the question, between myself and any person.

Just before proceeding upon this expedition to Wisconsin, where were you engaged in your business as a detective agent?

I leave all such like questions for Mr. Pinkerton to answer, for I do not consider it has anything whatever to do with this case.

As it may concern intimately your character and credit as a witness, you must permit me respectfully to persist in the inquiry of you, since Mr. Pinkerton is not now a witness on examination in this case.

I have answered, as far as I think it necessary, until my character is assailed.

Do you decline to answer the question?

I do, at present.

Were you, in the month of February last, employed and stationed near the town of Bucyrus, in the State of Ohio, to detect persons who had been robbing the cars of the Pittsburgh, Fort Wayne and Chicago Railway Company?

I answer this question in the same manner as I have cross-interrogatory 471, and I wish it to be understood that that is my general answer to all such like questions. My agreement with Mr. Pinkerton was, and is, that I should not make known any of his business outside of any call which I might be a witness in, and in no case whatever, excepting as a witness in the case; if I did, I would forfeit my agreement with him, and my discharge would certainly follow; and I have never known this rule, laid down by Mr. Pinkerton, departed from; those are my only reasons for declining to answer such like questions.

When I stated to the commissioner yesterday afternoon that the inquiries which I was about to make, were intended, and would be pursued in the full expectation of disclosing transactions of yours, which would successfully impeach your character and credit as a witness, and related to your operations in the vicinity of Bucyrus, in the State of Ohio, along the line of the Pittsburgh, Fort Wayne and Chicago Railroad, you remarked you had brothers of the same name as your own; did you, by that remark, intend to convey the impression that I was mistaken in the identity of the person; that it was not yourself, but another person by the name of Webster, and a brother of

yours, who was engaged in those transactions in the vicinity of Bucyrus ?

That conversation was not in reply to any question put to me by the commissioner; I then did and do still hold it side talk in the way of a jest with Mr. Stuart and Mr. Walker.

Did you mean to leave the impression that you were not the person ?

I was not addressing myself to the commissioner, nor did I suppose that he made any note of that conversation.

Do you decline a direct answer to that question ?

I do not; I had no object in view whatever.

Were you in the State of Ohio any, and what, portion of the month of February ?

I decline answering, for the reasons heretofore given.

Were you there under an assumed name ?

I decline answering for the reasons heretofore given.

Did you assume the name of Cook in the vicinity referred to ?

I decline answering, for the same reasons.

Were you there under the pretext of detecting and bringing to justice, persons who had for a considerable time theretofore been plundering or robbing the cars of the Pittsburgh, Fort Wayne and Chicago Railroad Company ?

I decline answering, for the same reason.

Did you become acquainted while there with certain persons named William Tate, one Jackson, Raymond, Arnold, and the father of Tate ?

I decline answering, for the same reasons.

Did you know James E. Bissell, James Boley, Christian Stribble, Samuel Bridgeman, Benjamin Rausoin and Frank Benedict; were they associated with you as employees from Pinkerton's office, along the line of that road, and in the vicinity before spoken of, under the same pretext of detecting persons who had been committing the offenses before referred to against the property of said company ?

I decline answering, for the same reason, and also for another reason, viz: that Mr. Pinkerton has lately told me that the persons which he was operating on, on the line of that railroad, were indicted and waiting trial.

Upon the morning of the 28th of February last, were not Arnold, Jackson, Raymond, William Tate, and his father, arrested on evidence furnished by you and those associated with you in this enterprise, charged with having stolen from the cars of the company, certain decoy goods, which had been theretofore purchased, which had been shipped in the company's cars, and were not those goods, upon search, found in the houses of Tate, Jackson and Raymond, respectively ?

I decline answering, for the same reason.

Did you not yourself steal those goods at night from the company's cars, take them to the house of Tate, and represent to the family that they were your goods, that you were about to to open a store in Osceola; and did you not thereafter, at Tate's house, break open the boxes of goods, and take therefrom, pants, vests, and other goods, when William Tate was absent from home; and did you not take those goods in a bundle, and leave a part of them at Raymond's, where they were subsequently found?.

I decline answering, for the same reason.

After the arrest of these parties, did you not write out a detailed account, professing to be a history of the whole transactions, which appeared in the Cincinnati and Pittsburgh papers, or do you not know that such an article was prepared by, or under the direction of, Mr. Pinkerton, and so published?

I decline answering, for the same reason.

In the month of May last, did not the trial of William Tate come on, in the county of Crawford, State of Ohio, and did not the defense rest upon the sole fact, established and supported by ten witnesses, that you yourself stole the decoy goods, deposited them as aforesaid, and then falsely charged the crime upon him; and was he not, on the trial, promptly and instantly acquitted by the jury?

I decline answering, for the same reason.

Did you not, immediately after the arrest of the victims of this conspiracy, leave that vicinity, and did you not refuse and fail to appear as a witness on the trial of the cause?

I decline answering, for the same reason.

Were not the other persons charged by you, and detected as the thieves and receivers of the property so stolen, also tried, and upon like plea supported by like proof, in the same manner promptly acquitted?

I decline answering, for the same reasons.

*Re-Examined.*

State whether the description of the land sold by Kinzie to you, as given in the first bond, was or not the same as that in the second bond, and whether or not the descriptions of said land in said bonds were correct.

There were mistakes made in both the first and second bonds, which was one of the causes of having the third bond made out. I think there was a slight difference in the bonds respecting the locations of the lands.

Was the third bond dated on the day it was written?

It was dated back to the date of the first bond, I think. It may have been dated from the second bond—but one or the

other. I am sure, for it was dated so by Kinzie's request. The third bond was recorded on the day which it was written on.

Do you mean that it was recorded, or handed in for record on that day?

I gave it to Mr. Lane, I think his name is, immediately after Mr. Frost had written it—Frost, I think, was the gentleman's name—and Mr. Lane told me he would attend to it immediately. The person whom I took to be the gentleman who recorded such papers, I found him in the office where Mr. Frost directed me to go.

Since you have had time to reflect as to whether you may not recollect who Isaac N. Parker is, will you please state what your best recollection now is?

Since reflecting, I think that was the person I bought a horse of; and if he be the same person, James Kinzie took me to one side at the time I was buying the horse, and told me to look out for him, for he was a damned rascal, and his bill of sale for a horse, or anything else, would be of no good, for he knew him well. And when I did buy the horse, I told him that he would have to get some one that was responsible to sign the bill of sale, besides himself. He said he would do so, and he did do so. The gentleman that did sign the bill of sale, I don't remember his name, but Kinzie told me that he was good, and a partner in the saloon where Millett, him and me used to visit, opposite Millett's office; and I have seen him in the same saloon. I remember the name now—it is Deersly.

A. W. WINDETT, R. S. BLACKWELL, and WALKER, VAN ARMAN & DEXTER, for Appellant.

E. C. LARNED, for Appellee.

CATON, C. J. The very large amount involved in this controversy, may explain why so many questions of law have been presented and very elaborately discussed. In a case of ordinary magnitude, many of them, perhaps, would not have been thought of, or if presented, would have been urged with less apparent confidence. While very large interests very naturally and very properly stimulate faithful counsel to great efforts and unusual acuteness, at the same time an overweening anxiety is liable to beget an overweening confidence. In this opinion, we must necessarily pass over many points which have been urged with more or less confidence, while we propose to consider, though briefly, all which are of real importance to be settled.

And first and most important of all, is the question of jurisdiction. The prayer of the bill is, that the heir of an

original grantor, whose unrecorded deed has been destroyed, be decreed to execute a new conveyance. Assuming that the ancestor once conveyed the premises to James Kinzie, and that that conveyance has been destroyed, the apparent title descended to the heir, and the temptation for him to assert such title, is certainly very strong. It is true the title never was in the heir. But the bare existence of a right, without the proof to establish such right, is as valueless as if no right existed. The title to land, under our law, can only be conveyed by the execution of paper writings. They are not only the evidence of the bargain and sale, but they are in truth and in fact the conveyance itself. They are the fact and deed, and not merely the evidence of the fact and deed. When these writings are executed with legal formality, the title is passed, and not till then. After that, the writings have performed a function which their destruction cannot defeat. The fact remains, and the title continues where it has been thus vested, although the best and even all evidence of the fact, may be destroyed. The deed is the best, though not the only evidence that it was executed, whereby the title was passed. When a deed is destroyed or lost, secondary or an inferior grade of evidence is admissible to establish the fact, which would be most satisfactorily established by the production and proof of the original deed itself. The highest degree or grade of this secondary evidence, is the record of the deed in the recorder's office, when such record exists; and the next is an examined copy of the deed, and last of all, parol evidence of the contents of the deed. He who possesses this highest evidence of title, is most secure in the enjoyment of his own, and he whose rights are entirely dependent upon this last, the lowest grade of proof, is in the greatest danger of losing that which is really and in truth his own. Such is the condition of the complainants here. The deed itself is lost or destroyed; it was never recorded, and no copy of it was ever made, and so far as we know, or have reason to believe, there is but one man living who ever read the deed and understands its contents. Upon the destruction of this proof, the title of the complainants, although it would still exist, would be practically lost, and the heir of the grantor would be invited to ignore the title conveyed by his father, and assert an unjust claim to this estate, and no power on earth could legally withhold it from him. While a title held subject to such hazard, is but of little value, the question is, whether the court of chancery has the power to furnish him with that higher and better degree of evidence of title which by misfortune he has lost. Confessedly no other tribunal has the power to do this, and if the court of chancery has it not, the wrong must be suffered

patiently. That it is right that the complainants should possess such proof of title as will forever secure them in its enjoyment, not only against the defendant Bennett, but all others, must and will be admitted by all men who are endowed with a proper sense of justice. The only way this can now be done, is to require the heir of the grantor, to whom the apparent title has descended, to renounce that title by quit-claiming all interest in the land or claim to such title. And why should he object to this, admitting the proof of the execution of the deed by his father to James Kinzie to be sufficient? The objection which his counsel urges is, that this deed was not lost through his fault or neglect, and that he is under no obligation to go to the trouble to sign the deed, merely for the benefit of another, through whose carelessness, perhaps, the deed was lost. While he claims no title to the land, he shall not be annoyed or disturbed about it, any more than any other stranger. This presents fairly, all that has ever been urged by any court, or by counsel, so far as we have observed, against the exercise of this jurisdiction by courts of equity. And upon this very ground, have some very respectable courts denied this power to the court. This reasoning is based upon such narrow, illiberal and selfish grounds, that we can hardly treat it with that respect which is due to those who have adopted it. That a party who, by his misfortune, or, if you please, his fault, has lost the only evidence of his rights which can render their enjoyment secure, shall not have that evidence restored, because it will subject this young gentleman to the inconvenience of writing his name to a deed! He says he owes the complainants no such duty. He forgets that society often imposes upon all its members the obligation to submit to inconveniences and trouble, and even expense, for the sole benefit of others. Where was the obligation resting upon Rufus Soules, to attend as a witness in this case? He was as much a stranger to it at least, as was the son of the grantor who sold this land and received the purchase money. What right have the courts to compel any one to quit his own affairs, no matter how pressing they may be, and attend as a witness or a juror in a litigation between strangers? This duty to assist others, who stand in need of our assistance, for the maintainance of their rights, necessarily flows from the relations we bear each other as members of the same community—we being mutually dependent upon each other for security and protection. What harm can there be in doing right to one party, if no wrong is done to another? What objection can the defendant have to releasing all claim to this property? If his father conveyed it to Kinzie, why should he object to execute a paper which will preclude him from asserting a claim to the

property, in case the complainants should lose the proof which they now have, to establish the deed ? The only rational motive which can be assigned, is his desire to retain a position which may enable him to assert a false claim to the property when time or accident shall have destroyed all evidence of the conveyance, which has been lost. An objection founded upon such motives, is repulsive to a proper sense of justice, and ought not to find a willing ear in a court of chancery. This question most generally arises, where the grantor is himself called upon to make a new conveyance to supply the place of the lost one, and his duty to do this, arises from more direct considerations, than impose a duty upon one. citizen to submit to inconvenience and trouble to enable another to enjoy his just rights. The benefit which he receives from the sale of the land, raises an implied obligation to do such future acts as circumstances may render necessary, to enable the purchaser to enjoy the fruits of the purchase. In case of the death of the grantor, the same duty, both moral and legal, devolves upon the heir. The authorities are no doubt somewhat conflicting upon this question ; but we cannot for a moment hesitate as to what is the true and practical rule. All sound reason, so far as we are capable of comprehending it, is in support of exercising this power. Its only tendency is to support the ends of justice, and to establish and vindicate right, while it can do no possible harm to any one ; unless it be a harm to deprive a party of the means to perpetrate a great wrong. It is no injury to a man to compel him to be honest. Nor does our statute which authorizes the perpetuation of testimony, take away from the court of chancery this power, and it scarcely presents a shadow of a reason why it should not be exercised. That, no doubt, affords some additional security to the parties claiming under the deed, but it leaves their rights still dependent upon the lowest class of evidence, which may be lost by some informality in taking the deposition, or by other casualty. We are far from admitting that the complainants would not be entitled to this relief, even if the deed had been regularly recorded in the recorder's office. Of the jurisdiction of the court to grant the relief sought, we have no doubt.

There are two important questions of fact presented in this record, the testimony taken upon which, has swelled the record to an immense volume, to thoroughly examine and understand which, we have spared no labor. Without this, we could make no real progress towards determining the real merits of the case. These questions are, *First*, did William Bennett actually convey the premises in question to James Kinzie ? and, *Second*, was the deed presented by Mr. Stow, executed by the William

Bennett to whom this land was patented by the United States?

The direct evidence upon the first point, is contained in the testimony of four witnesses. Rufus Soules, his wife, and daughter, swear to the existence of the deed, from Bennett to Kinzie, although neither of them pretend that it was ever actually delivered to Kinzie in person, or that he even ever saw it; while Kinzie himself swears, that he never purchased the land of Bennett, and never had any knowledge of any such deed; while the testimony of Soules, if it is to be believed, shows, that he told Kinzie that Bennett had executed such a deed, and left it with him for Kinzie, and that Kinzie promised to call and get it. It is simply a question of veracity between these witnesses. An immense number of witnesses were called to impeach and support both Soules and Kinzie, and the right of cross and re-examinations were completely exhausted, for the same purpose. We shall not attempt to review this evidence, for the purpose of vindicating the conclusion at which we have arrived. This could not be done within any reasonable limits of a judicial opinion. It is sufficient for the present case, that we simply state our conclusions, and such a review would be useless for the purpose of settling any principle, for the government of future cases. We are entirely satisfied from the evidence in this record, that William Bennett did execute and acknowledge a deed of the premises in question, to James Kinzie, and deliver the same to Rufus Soules, for the grantee named in the deed; and that afterwards, Soules informed Kinzie of this fact, who approved thereof, by promising to call and get it; and that this deed has been lost or destroyed, so that it cannot now be produced to establish the title of the complainants, who hold, under grants, executed by Kinzie, of these same premises. It has been strenuously urged, that the testimony of Soules does not sufficiently prove the contents of that deed. He gives the approximate date as 1838; he cannot remember the precise consideration, but says it was not large; he describes the land with most satisfactory certainty; tells us positively who the gantors and grantee were; says it was a quit-claim deed, and that there was no warranty about it. He thinks the deed was all in writing, but of this, he is not positive. The witness had it in his possession several years, and had carefully examined it and compared it with the *duplicate* which Bennett had left with him at the same time, and by means of which, he was enabled to describe the land with certainty. Parol proof of the contents of lost deeds must be so clear and positive, as to leave no reasonable doubt of the substance of the material parts of the paper. But that which would be of vital materiality in one

paper, or under certain circumstances, might be quite immaterial in another paper, or under other circumstances. In an action brought upon a lost note or bond, the precise sum mentioned in it, would be material, to determine how much the plaintiff would be entitled to recover; while the precise consideration mentioned in a deed, would be of but secondary importance, as the conveyance would be equally valid with a small as with a large sum. So, under certain circumstances, it would be of the last importance to know whether a deed contained covenants and warrantees, and of what precise character—as where an action is brought on the covenants in the deed, or where a claim is set up of an after acquired title, which would enure to the benefit of the grantee under a deed with warrantee, while it might not, under a mere release, or quit-claim. Such was the precise character of the case of *Rankin* v. *Crow*, 19 Ill. R. 626. There it was claimed, that a subsequently acquired title enured to the grantee in the deed, and the witness could not tell whether it was a quit-claim, or a warrantee deed, and, of course, it was held insufficient, while a question of warranty would be only material to test the accuracy of the witness' knowledge, or recollection, where the warranty could not affect the controversy in the particular case. The question in this case is, was there a deed executed by the alleged grantor to the grantee, founded upon a sufficient consideration to support it, and conveying the land in question? Upon this point, we can have no doubt, if the witness, Soules, is to be believed, and we do believe him. The circumstances under which this deed came to the knowledge and possession of this witness, are entitled to much consideration, in determining the sufficiency of the proof of the contents of this deed. Our only object in learning the contents of this deed with certainty, is to enable us to judge of its effect in this case. We are aided in this inquiry very much by the fact that the grantor, in the deed, presented it himself to Soules, as having been executed by him, for the express purpose of conveying the title to this land to James Kinzie. Knowing this to have been the avowed object of the grantor, it affords some presumption, at least, in aid of the parol proof, that the provisions of the deed were adequate to effectuate that object, and we may be less critical in examining the parol proof of the contents of a deed under such circumstances, than where we are left in total ignorance of the objects of the grantor, except as derived from the examination of the paper alone by the witness. These very circumstances would have a strong tendency to fix upon the mind of the witness, the true character of the paper, when he subsequently examined it. We think the proof of the contents of the deed sufficient.

It has been also objected that the proof does not show a delivery of this deed to, and an acceptance of it by James Kinzie, and that hence the title never vested in him. We do not propose to embrace this occasion to go into an elaborate examination as to what is necessary to constitute a delivery and acceptance of a deed, so as to vest the title, but shall reserve that for some other occasion. When that is done, we shall see that when Bennett had delivered the deed to Soules, with instructions for him to deliver it to Kinzie, and had thus put it beyond his control, for the express purpose of having it take effect as a deed, and Soules informed Kinzie of that fact, and desired him to call and get the deed, and Kinzie approved of and sanctioned this, by promising to call for it soon, this constituted in law a delivery and acceptance of the deed, and from that time, the title was vested in Kinzie. Thenceforth Soules held the deed, not as the agent of Bennett, but of Kinzie alone. Then it ceased to be an escrow, and became an operative conveyance. But, if we could agree with the defendants' counsel, and conclude that the deed never was accepted by Kinzie, but that it ever remained an escrow, we should have been spared the trouble of discussing the question of jurisdiction, which we have already considered. Then we should have nothing to do but to enforce the specific performance of the agreement to convey the premises to Kinzie, which was sufficiently evidenced in writing by the deed left with Soules. No delivery to, or acceptance by Kinzie, was necessary to make the deed a binding memorandum in writing for the conveyance of land, within the statute of frauds, and as such it could be enforced in a court of equity, for we presume it will hardly be denied, even in this case, that the court of chancery has jurisdiction to enforce the specific performance of such a contract.

We may next consider the objection which is made, that the deed from James Kinzie to John H. Kinzie and Hiram Pearsons, was a quit-claim deed, and was executed before the deed from Bennett to him. So that the title subsequently acquired does not enure under it to the benefit of the grantees. If it be but a quit-claim deed, it contains a covenant for further assurances; under this covenant, a subsequent title enures, as well as under a covenant of warranty. The reason why a subsequently acquired title is held to pass by a deed containing covenants of warranty, is, that it effectuates the real intent of the parties which was to convey the true and real title to the land, and to avoid circuity of action and further litigation. It is a principle of equitable jurisprudence, adopted by the courts of law, and by them engrafted into the common law itself, and has been sanctioned by our statute. The same reasoning applies, in the

same terms and with equal force, where the deed contains a deed for further assurances, as where it contains a covenant of warranty. By this deed, Kinzie " remised, released, and forever quit-claimed " to the grantees, " all that certain piece or parcel of land, described as follows, to wit: " and assumes this covenant: " That he, the said James Kinzie, will, with all convenient speed, obtain a patent for said above described premises, and will, whenever called upon by said John H. and Hiram, their heirs and assigns, after obtaining said patent, make, execute and deliver to said John H. and Hiram, their heirs or assigns, such other deeds of conveyance, with full covenants, (and releasing dower,) of said premises, for the conveying, investing and assuring to the said John H. Kinzie, and Hiram Pearsons, a full and perfect title in fee simple to said premises, as they, the said John H. Kinzie and Hiram Pearsons, their heirs or assigns, or his or their counsel learned in the law, shall reasonably devise, advise or require." This deed is not a mere release of whatever interest the grantor had in the premises, but by it, he remised, released and forever quit-claimed the land itself, and in this it differs from the deed in *Frink* v. *Darst*. But without saying that, under our statutes, these expressions would carry the subsequently acquired title, we have no hesitation in saying, that the covenant does. It shows the the unqualified intention of the grantor, to invest the grantees with all the title which he then had, or which he might subsequently acquire, and when such is the case, the subsequently acquired title must be held to pass upon equitable principles, adopted and enforced by the courts of law, and much more so, in a proceeding in chancery as this is. Such was the effect given to the deed in *Kellogg* v. *Phillips*, 15 Ill. R. 131. In that case, the grantor only professed to convey whatever interest he had in the land, and not the land itself; but he covenanted that if he should subsequently acquire a better title, it should enure to the grantees in the deed. There the intention of the parties was allowed to prevail, and we held that the subsequent title passed.

But admitting that in this case, the subsequent legal title did not pass by this deed, it would be no ground for reversing this decree. That covenant for further assurances, runs with the land, and becomes a covenant to all grantees of Kinzie and Pearsons, and it is admitted by the stipulation and shown by the conveyances, that these complainants are such grantees. So that they could in equity enforce specifically the performance of this covenant against Kinzie, as the equitable owners of the land under him. This of itself, was sufficient to authorize the court to decree the execution of a new deed by the heir of the

grantor to James Kinzie, to supply the place of the one lost, which places him in a position to be coerced by a court of equity to perform this covenant specifically to the complainants.

It is also objected, that no affidavit of the loss of this deed was filed with the bill. If this were a case in which an affidavit was required, it is too late now to raise this objection, after the proof has shown that very fact. It would be the merest trifling for the court to listen to such an objection now, with this proof before us.

Another objection was made as to the time of the appointment of the guardian *ad litem*, which we do not consider tenable.

There is but one other question in the case, which we feel called upon to examine; that is, whether the deed which Stow presents, purporting to be a conveyance from William Bennett, is genuine or not. Notwithstanding the very elaborate written argument which has been presented by the counsel for Stow, covering more than one hundred and twenty pages, devoted entirely to this question, we shall dispose of it in a single sentence: the proofs leave not a shadow of doubt on our minds, that it is a base forgery or fraud.

The decree of the court below is affirmed.

*Decree affirmed.*